**KULUKUNDIS SHIPPING CO., S/A, v. AMTORG TRADING CORPORATION.**

**No. 170.**

Circuit Court of Appeals, Second Circuit.

March 2, 1942.

Edward Ash, of New York City (Charles Recht and David Drucker, both of New York City, on the brief), for respondent-appellant.

Charles R. Hickox, of New York City, for libellant-appellee.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The libel alleged that appellant (respondent) had, through its authorized repre-

980

sentatives, agreed to a charter party with appellee (libellant). Appellant's answer in effect denied that anyone authorized to act for it had so agreed.[1] After a trial, the district court made the following

### "Findings of Fact

"1. Libellant, Kulukundis Shipping Co. S/A, employed Blidberg Rothchild Co. Inc. as a broker and the respondent, Amtorg Trading Corporation employed Potter & Gordon, Inc. as its broker in the negotiations for the chartering of the ship 'Mount Helmos' for a trip to Japan. On March 15, 1940, Rothchild, of the firm of Blidberg Rothchild Co. Inc., and Gordon, acting on behalf of Potter & Gordon, Inc., agreed upon a charter and closed by Gordon executing and delivering to Rothchild a fixture slip which is the usual trade practice, indicating the conclusion of charter negotiations in the trade of ship brokerage. All the material terms of the bargain are set forth in the fixture slip excepting demurrage, dispatch, and the date of the commencement of the charter term which all had been agreed on but were omitted by an oversight. A number of the terms, including the War Risks Clause of 1937, were fixed by the incorporation of a reference to an earlier charter of the steamer 'Norbryn.' Gordon acted with authority.

"2. Thereafter, respondent refused to sign the charter but instead repudiated it."

### "Conclusions of Law

"1. Respondent has breached a valid contract and is liable in damages to the libellant."

Pursuant to the foregoing, the court entered an order that appellee recover from appellant the damages sustained, and referred to a named commissioner the ascertainment of the damages, to be reported to the court.

■ 1. The errors assigned on this appeal by appellant (with an exception we shall discuss later) relate to the admissibility of certain letters, the weight and sufficiency of the evidence, and the credibility of witnesses. The letters, for reasons adequately stated in the district court's opinion, were properly admitted in evi-

dence. There is no need in this opinion to discuss the other errors. We do not sit as triers of the facts. In the light of Admiralty Rule 46½, 28 U.S.C.A. following section 723, it is for the trial judge, not for us, after hearing the witnesses, to pass on the weight of the evidence, consider questions of credibility and make findings.[2] In this case, as the findings are not clearly erroneous, we cannot disturb them. The Aakre, 2 Cir., 1941, 122 F.2d 469, 474 certiorari denied, Waterman v. The Aakre, December 8, 1941, 62 S.Ct. 360, 86 L.Ed. ——; Johnson v. Andrus, 2 Cir., 1941, 119 F.2d 287.

2. But there is an error assigned which is of a different character. The appellant, in its answer originally filed, pleaded that no contract had been made. No steps of any importance having meanwhile occurred in the suit, some nine months later and two months before the trial, it sought to amend its answer by including, as a separate defense, the fact that the alleged charter party upon which appellee was suing contained an arbitration clause, that appellee had not at any time asked appellant to proceed to arbitration, and that therefore the suit had been prematurely brought. This motion to amend was denied. If the amendment should have been allowed, the additional defense can now be urged.

The arbitration clause reads as follows: "24. Demurrage or despatch is to be settled at loading and discharging ports separately, except as per Clause 9. Owners and Charterers agree, in case of any dispute or claim, to settle same by arbitration in New York. Also, in case of a dispute of any nature whatsoever, same is to be settled by arbitration in New York. In both cases arbitrators are to be commercial men."

In 1925 Congress enacted the Arbitration Act, U.S.C.A., Title 9. Pertinent sections of that statute read as follows:

"§ 2. Validity, irrevocability, and enforcement of agreements to arbitrate. A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or

---

[1] Appellant's motion to amend its answer we shall discuss later.

[2] Matton Oil Transfer Corp. v. The Dynamic, 2 Cir., December 1, 1941, 123 F.2d 999; cf. United States v. Forness, 2 Cir., January 20, 1942, 125 F.2d 928, 942.

the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. * * *

"§ 3. Stay of proceedings where issue therein referable to arbitration. If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration. * * *

"§ 4. Failure, etc., to arbitrate under agreement; petition to United States court having jurisdiction for order to compel arbitration; notice and service thereof; hearing and determination. A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any court of the United States which, save for such agreement, would have jurisdiction under the judicial code at law, in equity, or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by law for the service of summons in the jurisdiction in which the proceeding is brought. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The

hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by law for referring to a jury issue in an equity action, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof."

 Appellant admits—as it must—that the district court had jurisdiction to determine whether the parties had made an agreement to arbitrate.[3] Appellant contends, however, that, once the court determined in this suit that there was such an arbitration agreement, the court lost all power over the suit beyond that of staying further proceedings until there had been an arbitration as agreed to;[4] in that arbitration, argues appellant, the arbitrators will have jurisdiction to determine all issues except the existence of the arbitration clause. This jurisdiction, it is urged, is broad enough to permit an independent determination, by the arbitrator, that the contract itself is not valid or binding. Appellee asserts that the defendant had repudiated the charter-party, and that, therefore, the arbitration clause must be wholly disregarded.

---

3 Under Section 3 of the Act, the court cannot grant a stay until it is "satisfied that the issue involved in such suit * * * is referable to arbitration under" an "agreement in writing for * * * arbitration." Clearly the court cannot be thus "satisfied" without a determination that the parties made such an agreement to arbitrate.

4 Or, if plaintiff had so requested, then under Section 4, directing the parties to proceed with the arbitration.

In considering these contentions in the light of the precedents, it is necessary to take into account the history of the judicial attitude towards arbitration: The English courts, while giving full effect to agreements to submit controversies to arbitration after they had ripened into arbitrators' awards, would—over a long period beginning at the end of the 17th century—do little or nothing to prevent or make irksome the breach of such agreements when they were still executory.[5] Prior to 1687, such a breach could be made costly: a penal bond given to abide the result of an arbitration had a real bite, since a breach of the bond's condition led to a judgment for the amount of the penalty. It was so held in 1609 in Vynior's Case, 8 Coke Rep. 81b. To be sure, Coke there, in a dictum, citing precedents, dilated on the inherent revocability of the authority given to an arbitrator;[6] such a revocation was not too important, however, if it resulted in a stiff judgment on a penal bond. But the Statute of Fines and Penalties (8 & 9 Wm. III c. 11, s. 8), enacted in 1687, provided that, in an action on any bond given for performance of agreements, while judgment would be entered for the penalty, execution should issue only for the damages actually sustained.[7] Coke's dictum as to revocability, uttered seventy-eight years earlier, now took on a new significance, as it was now held that for breach of an undertaking to arbitrate the damages were only nominal.[7a] Recognizing the effect of the impact of this statute on executory arbitration agreements, Parliament, eleven years later, enacted a statute, 9 Wm. III c. 15 (1698), designed to remedy the situation by providing that, if an agreement to arbitrate so provided, it could be made a "rule of court" (i. e., a court order), in which event it became irrevocable, and one who revoked it would be subject to punishment for contempt of court; but the submission was revocable until such a rule of court had been obtained. This statute, limited in scope, was narrowly construed and was of little help.[8] The ordinary execu-

---

5 The early English history of enforcement of executory arbitration agreements is not too clear. Arbitration was used by the medieval guilds and in early maritime transactions. Some persons trace an influence back to Roman law, doubtless itself affected by Greek law; others discern the influence of ecclesiastical law. See Sayre, Development of Commercial Arbitration Law, 37 Yale L. J. (1927) 595, 597; Jones, Development of Commercial Arbitration, 21 Minn.L.Rev. (1927) 240, 243–244; Baum and Pressman, The Enforcement of Commercial Arbitration, 8 N.Y.U.L.Q.Rev. (1930) 238, 239–249; Red Cross Line v. Atlantic Fruit Co., 1924, 264 U.S. 109, 121, 44 S.Ct. 274, 68 L.Ed. 582; Cohen, Commercial Arbitration and The Law (1918); Aristotle, Rhetoric, Bk. I, Ch. 13, 1374b; Vinogradoff, 2 Historical Jurisprudence (1922) 50, 146, and Aristotle and Legal Redress, 14 Col.L.Rev. (1914) 548, 559; Buckland, Textbook of Roman Law (1921) 527–528; Radin, Handbook of Roman Law (1927) 308.

6 Cohen, loc. cit., 104ff, criticizes Coke's use of the precedents; Sayre, loc. cit., is on Coke's side. Cf. Peterson, J., dissenting in Park Const. Co. v. Independent School Dist., 1941, 209 Minn. 182, 296 N.W. 475, 478ff, 135 A.L.R. 59.

That Coke was not always an honest or careful reporter of precedents, see authorities cited, United States v. Forness, 2 Cir., 125 F.2d 928 notes 32 and 33; Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 344 notes 24 and 29; Veeder, The English Reports 1537–1895, in 2 Select Essays in Anglo-American Legal History, 131–132; Bolland, Manual of Year Book Studies (1925) 85–86; 22 Halsbury, Laws of England (1st ed., 1912) 128, 152; Boulton v. Bull, 2 H. Bl. 463, 491 (1795), 126 Eng.Rep. 651, 665.

7 9 C.J. pp. 128, 129; 11 C.J.S., Bonds, § 130; 12, Holdsworth, History of English Law (1938) 519–520.

7a See Sayre, loc. cit. at 604.

8 See Sayre, loc. cit. at 606; Annotation, 47 L.R.A.,N.S., 436; Chaffee & Simpson, 1 Cases on Equity (1934) 552–553.

In 1833, a statute (3 & 4 Wm. IV, c. 42) was passed which was intended to reinforce the 1680 statute, but it still left a submission revocable until an action was brought in connection with an arbitration proceeding.

An Act of 1854 (17 & 19 Vict. c. 125) provided that any arbitration agreement could be made the basis of a stay and irrevocable except by leave of court, granted in the exercise of the court's discretion.

The Arbitration Act of 1889 (52 & 53 Vict. c. 49) provided that any such agreement, unless a contrary intention is expressed therein, shall be irrevocable, except by leave of court, and shall have the same effect as if it had been made an order of court; it provided adequate court review of questions of law raised in the arbitration hearing. See Sayre, loc. cit., 606–607; 47 L.R.A.,N.S., 436ff; Chaffee & Simpson, loc. cit.

tory arbitration agreement thus lost all real efficacy since it was not specifically enforceable in equity, and was held not to constitute the basis of a plea in bar in, or a stay of, a suit on the original cause of action.[8a] In admiralty, the rulings were much the same.

It has been well said that "the legal mind must assign some reason in order to decide anything with spiritual quiet."[8b] And so, by way of rationalization, it became fashionable in the middle of the 18th century to say that such agreements were against public policy because they "oust the jurisdiction" of the courts.[9] But that was a quaint explanation, inasmuch as an award, under an arbitration agreement, enforced both at law and in equity, was no less an ouster; and the same was true of releases and covenants not to sue, which were given full effect. Moreover, the agreement to arbitrate was not illegal, since suit could be maintained for its breach. Here was a clear instance of what Holmes called a "right" to break a contract and to substitute payment of damages for non-performance;[10] as, in this type of case, the damages were only nominal, that "right" was indeed meaningful.

An effort has been made to justify this judicial hostility to the executory arbitration agreement on the ground that arbitrations, if unsupervised by the courts, are undesirable, and that legislation was needed to make possible such supervision.[11] But if that was the reason for unfriendliness to such executory agreements, then the courts should also have refused to aid arbitrations when they ripened into awards. And what the English courts, especially the equity courts, did in other contexts, shows that, if they had had the will, they could have devised means of protecting parties to arbitrations. Instead, they restrictively interpreted successive statutes intended to give effect to executory arbitrations.[12] No similar hostility was displayed by the Scotch courts.[13] Lord Campbell explained the English attitude as due to the desire of the judges, at a time when their salaries came largely from fees, to avoid loss of income.[14] Indignation

---

[8a] See 1 Chaffee & Simpson, loc. cit. 520ℑ; Tobey v. County of Bristol, 23 Fed.Cas. page 1313, No. 14,065, 3 Story 800; 2 Story, Equity Jurisprudence, Section 670.

[8b] Hough, J., in United States Asphalt R. Co. v. Trinidad Lake P. Co., D.C. 1915, 222 F. 1006, 1008. He discusses and shows the "worthlessness" of the several "causes advanced for refusing to compel men to abide by their arbitration contracts."

[9] This phrase seems to have been coined in Kill v. Hollister, 1 Wils. 129 (1746). Some judges justified it by referring to Coke on Littleton, 53b; "If a man make a lease for life, and by deed grant that if any waste or destruction be done, that it shall be redressed by neighbors, and not by suit or plea," nevertheless an "action of waste shall lye, for the place wasted cannot be recovered without a plea." See critical comments by Creswell and Campbell in Scott v. Avery, 5 H.C.L. 811, 837, 853 (1855).

Campbell, here as elsewhere, was distinctly not Coke-eyed.

[10] Holmes, The Path of The Law, 10 Harv.L.Rev. (1897) 457, reprinted Holmes, Collected Legal Papers (1920) 167, 175. Cf. Globe Refining Co. v. Landa Cotton Oil Co., 190 U.S. 540, 543, 23 S.Ct. 754, 47 L.Ed. 1171; 1 Holmes-Pollock Letters (1941) 80, 119 note, 120, 177 and note; Holland, Jurisprudence (4th ed.) 212–213.

[11] Sayre, loc. cit.; Peterson, J., dissenting in Park Const. Co. v. Independent School Dist., supra. Sayre argues that if the courts had really been unfriendly to arbitrations they would not have enforced arbitrators' awards. The real truth, however, seems to be that they were unfriendly but did not carry out their hostility to its logical conclusion.

[12] See the statutes cited in note 8, and Annotation, 47 L.R.A.,N.S., 436; Chaffee & Simpson, loc. cit.

[13] See cases cited later in this opinion.

The Scotch attitude may well have been due to Roman law influences. As to such influences on Scotch law generally, see Radin, Book Review, 45 Yale L.J. (1935) 380, reviewing Mackintosh, Roman Law in Modern Practice (1933).

[14] "The doctrine," he said, "had its origin in the interests of the judges. There was no disguising the fact that, as formerly, the emoluments of the Judges depended mainly, or almost entirely, upon fees, and as they had no fixed salaries, there was great competition to get as much as possible of litigation into Westminster Hall, and a great scramble in Westminster Hall for the division of the spoil * * * And they had great jealousy of arbitrations whereby Westminster Hall was robbed of those cases which came not into Kings Bench, nor the Common Pleas, nor the Exchequer. Therefore they said that the courts ought not to be ousted of their jurisdiction, and that it was contrary to the policy of the law to do so. That really grew up only subsequently to the time of Lord Coke,

has been voiced at this suggestion;[15] perhaps it is unjustified.[16] Perhaps the true explanation is the hypnotic power of the phrase, "oust the jurisdiction."[17] Give a bad dogma a good name and its bite may become as bad as its bark.

In 1855, in Scott v. Avery, 5 H.C.L. 811, the tide seemed to have turned. There it was held that if a policy made an award of damages by arbitrators a condition precedent to a suit on the policy, a failure to submit to arbitration would preclude such a suit, even if the policy left to the arbitrators the consideration of all the elements of liability. But, despite later legislation, the hostility of the English courts to executory arbitrations resumed somewhat after Scott v. Avery, and seems never to have been entirely dissipated.

That English attitude was largely taken over in the 19th century by most courts in this country. Indeed, in general, they would not go as far as Scott v. Avery, supra,[18] and continued to use the "ouster of jurisdiction" concept:[19] An executory agreement to arbitrate would not be given specific performance or furnish the basis of a stay of proceedings on the original cause of action. Nor would it be given effect as a plea in bar, except in limited instances, i. e., in the case of an agreement expressly or impliedly making it a condition precedent to litigation that there be an award determining some preliminary question of subsidiary fact upon which any liability was to be contingent. Hamilton v. Liverpool, 1890, etc., Ins. Co., 136 U.S. 242, 255, 10 S.Ct. 945, 34 L.Ed. 419. In the case of broader executory agreements, no more than nominal damages would be given for a breach.[20]

Generally speaking, then, the courts of this country were unfriendly to executory arbitration agreements. The lower federal courts, feeling bound to comply with the precedents, nevertheless became critical of this judicial hostility.[21] There were intimations in the Supreme Court that perhaps the old view might be abandoned, but in the cases hinting at that newer attitude the issue was not raised.[22] Effective state arbitration statutes were enacted beginning with the New York Statute of 1920.[23]

---

and a saying of his was the foundation of the doctrine." Scott v. Avery, 25 L. J.Ex. 308, 313; the report of his remarks in 5 H.C.L. 811 is more meager.

[15] See Sayre, loc. cit.; dissenting opinion of Peterson in Park Const. Co. v. Independent School Dist., supra.

[16] Yet able historians have stressed this pecuniary motive as an important factor in the struggles for jurisdiction between the several English courts; see Goebel, Cases and Materials in Development of Legal Institutions (1937) 90, 120, 206, 221; 1 Holdsworth, History of English Law (3d ed. 1922) 254, 255, 259, 261; 2 ibid. (3d ed. 1923) 591; Usher, Rise and Fall of The High Commission (1913) 55; cf. Adam Smith, Wealth of Nations (Modern Library ed. 1937) Bk. V, Pt. II, p. 679; 6 Wigmore on Evidence (3d Ed., 1940) § 1845, note 6. And as to the effect of this same factor in the fight between the common law courts and Chancery; see Taylor v. Carryl, 20 How. 583, 612–617, 15 L.Ed. 1028; Fischer v. Carey, 173 Cal. 185, 189, 159 P. 577, L.R.A. 1917A, 1100; 2 Campbell, Lives of The Chancellors, 184–185.

[17] Words sometimes have such potency. For an excellent 18th century American essay on "semantics" along these lines, see Mr. Justice Wilson's opinion in Chisholm v. Georgia, 1793, 2 Dall. 419, 454ff, 1 L.Ed. 440; Cf. United States v. Forness, 2 Cir., January 20, 1942, 125 F.2d 928, 934, and note 9.

[18] See, e. g., Whitney v. National Masonic Accident Ass'n, 52 Minn. 378, 54 N.W. 184; Annotation, 47 L.R.A.,N. S., at page 448.

[19] E. g., Insurance Co. v. Morse, 1874, 20 Wall. 445, 451, 22 L.Ed. 365.

[20] See Williston, 6 Contracts (rev. ed. 1938), Section 1927A (p. 5392, note 9); Munson v. Straits of Dover S. S. Co., 2 Cir., 102 F. 926; but cf. McCullough v. Clinch-Mitchell Const. Co., 8 Cir., 71 F.2d 17; Annotation, 47 L.R.A.,N.S., 409, 410.

An agreement to submit to arbitration could be made a rule of court. Heckers v. Fowler, 2 Wall. 123, 17 L.Ed. 759; United States v. Farragut, 22 Wall. 406, 419, 22 L.Ed. 879; Annotation, 42 A. L.R. 727, 736–739.

[21] See, e. g., the sarcastic remarks of Hough, J., in United States Asphalt Refining Co. v. Trinidad Petroleum Co., D.C.1915, 222 F. 1066; Mack, J., in Atlantic Fruit Co. v. Red Cross Line, D.C.1921, 276 F. 319; Atlantic Fruit Co. v. Red Cross Line, 2 Cir., 1924, 5 F.2d 218.

[22] The Atlanten, 1920, 252 U.S. 313, 315, 40 S.Ct. 332, 64 L.Ed. 586; Red Cross Line v. Atlantic Fruit Co., 1924, 264 U.S. 109, 123, 124, 44 S.Ct. 274, 68 L.Ed. 582.

[23] For a discussion of the earlier American state legislation, see Chaffee and Simpson, 1 Cases on Equity (1934) 552–553; Sturges, Commercial Arbitration (1930) Sections 1–6.

■ The United States Arbitration Act of 1925 was sustained as constitutional, in its application to cases arising in admiralty. Marine Transit Corp. v. Dreyfus, 1932, 284 U.S. 263, 52 S.Ct. 166, 76 L.Ed. 516. The purpose of that Act was deliberately to alter the judicial atmosphere previously existing. The report of the House Committee[24] stated, in part: "Arbitration agreements are purely matters of contract, and the effect of the bill is simply to make the contracting party live up to his agreement. He can no longer refuse to perform his contract when it becomes disadvantageous to him. An arbitration agreement is placed upon the same footing as other contracts, where it belongs. * * * The need for the law arises from an anachronism of our American law. Some centuries ago, because of the jealousy of the English courts for their own jurisdiction, they refused to enforce specific agreements to arbitrate upon the ground that the courts were thereby ousted from their jurisdiction. This jealousy survived for so long a period that the principle became firmly embedded in the English common law and was adopted with it by the American courts. The courts have felt that the precedent was too strongly fixed to be overturned without legislative enactment, although they have frequently criticized the rule and recognized its illogical nature and the injustice which results from it. The bill declares simply that such agreements for arbitration shall be enforced, and provides a procedure in the Federal courts for their enforcement. * * * It is particularly appropriate that the action should be taken at this time when there is so much agitation against the costliness and delays of litigation. These matters can be largely eliminated by agreements for arbitration, if arbitration agreements are made valid and enforceable."

In the light of the clear intention of Congress,[24a] it is our obligation to shake off the old judicial hostility to arbitration. Accordingly, in a case like this, involving the federal Act, we should not follow English or other decisions which have narrowly construed the terms of arbitration agreements or arbitration statutes. With this new orientation, we approach the problems here presented. They are twofold: (a) Does the arbitration provision here have the sweeping effect ascribed to it by appellant? (b) Is it, as appellee contends, wholly without efficacy because appellant asserted that there never was an agreement for a charter party? We shall consider these questions in turn:

■ To the appellant's sweeping contention there are several answers:

(a) Appellant, as we saw, concedes that, in such a case as this, before sending any issue to arbitrators, the court must determine whether an arbitration provision exists.[25] As the arbitration clause here is an integral part of the charter party, the court, in determining that the parties agreed to that clause, must necessarily first have found that the charter party exists.[26] If the court here, having so found, were now to direct the arbitrators to consider that same issue, they would be traversing ground already covered in the court trial. There would thus result precisely that needless expenditure of time and money (the "costliness and delays of litigation") which Congress sought to avoid in enacting the Arbitration Act. In the light of that fact, a reasonable interpretation of the Act compels a repudiation of appellant's sweeping contention.

---

[24] 68 Cong., 1st Sess., House of Rep. Report No. 96.

[24a] The United States Arbitration Act of 1925 was not the first evidence that Congress was not in sympathy with judicial hostility to arbitration. In 1860, foreign service officers were assigned the duty of encouraging the settlement of disputes by arbitration. These officers were, and still are, authorized to prepare submissions, accept acknowledgments, and indorse such awards. See 22 U.S.C.A. § 161. The Bankruptcy Act of 1898 authorized the submission to arbitration of disputes arising in the settlement of estates. The provision is § 26 of the present Act, 11 U.S.C.A. § 49. There is an arbitration provision in the Suits in Admiralty Act of 1920, 46 U.S.C.A. § 786.

Since 1909 it has been a criminal offense for an arbitrator acting under a federal act to accept a bribe. 18 U.S.C.A. § 239. This trend toward encouraging arbitration has not waned. An arbitration provision was included in the Federal Prison Industries Act of 1930, 18 U.S.C. A. § 744g, and the Norris-La Guardia Act bars injunctive relief to a complainant who has failed to make a reasonable effort to settle a labor dispute by arbitration. 29 U.S.C.A. § 108. There are also elaborate provisions for arbitration in the Railway Labor Act of 1926, 45 U.S.C.A. §§ 157–159.

[25] See Section 3 of the Act.

[26] The situation would be different if a separate arbitration agreement had been made.

(b) If the issue of the existence of the charter party were left to the arbitrators and they found that it was never made, they would, unavoidably (unless they were insane), be obliged to conclude that the arbitration agreement had never been made. Such a conclusion would (1) negate the court's prior contrary decision on a subject which, admittedly, the Act commits to the court, and (2) would destroy the arbitrators' authority to decide anything and thus make their decision a nullity. Cf. Phillips, The Paradox in Arbitration Law, 46 Harv. L.Rev. (1933) 1258, 1270-1272; Phillips, A Lawyer's Approach to Commercial Arbitration, 41 Yale L.J. (1934) 31; 6 Williston, Contracts (Rev.ed.1938), Section 1920 (pp. 5369-5379).

■ (c) The Arbitration Act does not cover an arbitration agreement sufficiently broad to include a controversy as to the existence of the very contract which embodies the arbitration agreement. Section 2 of the Act describes only three types of agreement covered by the Act: One type is "an agreement * * * to submit to arbitration an existing controversy arising out of * * * a contract, transaction," etc.; thus the parties here, after a dispute had arisen as to the existence of the charter party, might have made an agreement to submit to arbitration that "existing" controversy. But that is not this case. Section 2 also includes a "provision in * * * a contract evidencing a transaction * * * to settle by arbitration a controversy thereafter arising out of such contract or transaction * * *." Plainly such a provision does not include a provision in a contract to arbitrate the issue whether the minds of the parties ever met so as to bring about the very contract of which that arbitration clause is a part; a controversy relating to the denial that the parties ever made a contract is not a controversy arising out of that contract. Nor is it a controversy "arising out of a transaction evidenced by a contract," for if no contract existed then there was no such transaction evidenced by a contract and, therefore, no controversy arising out of that transaction. The third type of arbitration agreement described in Section 2 of the Act is a provision in a con-

tract to settle by arbitration "a controversy thereafter arising out of * * * the refusal to perform the whole or any part thereof." This is familiar language; it refers to a controversy, which parties to a contract may easily contemplate, arising when a party to the contract, without denying that he made it, refuses performance; it does not mean a controversy arising out of the denial by one of the parties that he ever made any contract whatsoever.

It is clear then that, even assuming, arguendo, that a contract could be drawn containing an arbitration clause sufficiently broad to include a controversy as to whether the minds of the parties had ever met concerning the making of the very contract which embodies the arbitration clause,[27] such a clause would not be within the Arbitration Act. Accordingly, it perhaps would not be immunized from the prestatutory rules inimical to arbitration, i.e., would not serve as the basis of a stay of the suit on the contract, leaving the parties to the arbitration called for by their agreement. Were the arbitration clause here sufficiently broad to call for arbitration of the dispute as to the existence of the charter party, it would, therefore, perhaps be arguable that it was entirely outside of the Act and, accordingly, irrelevant in the case before us;[28] we need not consider that question, as we hold that the breadth of the arbitration clause is not so great and it is within the terms of Section 2 of the Act.

■ We conclude that it would be improper to submit to the arbitrators the issue of the making of the charter party.

But it does not follow that appellant was not entitled to a stay of the suit, under Section 3, until arbitration has been had as to the amount of the damages.[29] Here it is important to differentiate between Sections 3 and 4 of the Act. Under Section 4, the proceeding—as the Supreme Court observed in Marine Transit Corp. v. Dreyfus, 284 U.S. 263, 278, 52 S.Ct. 166, 76 L.Ed. 516—is one for specific performance: One of the parties seeks "an order directing that * * * arbitration proceed in the manner

---

[27] Conceivably parties might execute a writing which would include a clause to the effect that the writing should not be binding unless John Jones should decide that it contained necessary legal formalities. But we find it difficult to conceive of a case of an agreement containing an effective clause that a third person should

determine whether the parties had ever talked about the agreement.

[28] But cf. McCullough v. Clinch-Mitchell Const. Co., 8 Cir., 71 F.2d 17, 21.

[29] While it is not literally so worded, we treat, as an application for a stay, the new matter in the amended answer which appellant asked leave to file.

provided for" in the arbitration clause or agreement. It may well be that in a proceeding under Section 4, there are open many of the usual defenses available in a suit for specific performance.[30] It would seem that a court, when exercising equity powers, should do so on the basis of a fully informed judgment as to all the circumstances. We recognize that some authorities have held to the contrary under similarly worded state arbitration statutes, interpreting them to require the courts automatically to decree specific performance without regard to the usual equitable considerations.[31] It is difficult for us to believe that Congress intended us so to construe Section 4, although we do not here decide that question.[32] However that may be, the same equitable considerations should surely not be applicable when a defendant asks a stay pursuant to Section 3. For he is not then seeking specific performance (i.e., an order requiring that the parties proceed to arbitration) but merely a stay order of a kind long familiar in common law, equity and admiralty actions. His position is that when the court (to quote Section 3) is "satisfied that the issue involved in such suit * * * is referable to arbitration," the court must "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." There is a well recognized distinction between such a stay and specific performance: The first merely arrests further action by the court itself in the suit until something outside the suit has occurred; but the court does not order that it shall be done. The second, through the exercise of discretionary equity powers, affirmatively orders that someone do (or refrain from doing) some act outside the suit.

The Supreme Court has made just this distinction between Sections 3 and 4. In Shanferoke Corp. v. Westchester Corp., 1935, 293 U.S. 449, 452, 453, 55 S.Ct. 313, 315, 79 L.Ed. 583, in which it sustained this court in granting a stay when the arbitration clause provided for specific performance by the New York courts of the agreement to arbitrate, the Supreme Court said: "Whether it [the contract] should be construed so as to exclude the bringing of a suit in the federal court to compel specific performance of the agreement to arbitrate, we have no occasion to decide. For the District Court was not asked, in the proceedings now under review, to compel specific performance. The motion was to stay the action until arbitration shall have been had; and the direction of the Court of Appeals was limited to granting a stay. Section 3 of the United States Arbitration Act * * * provides broadly that the court may 'stay the trial of the

---

[30] Note the statement in the Congressional Committee's report: "An arbitration agreement is placed upon the same footing as other contracts, where it belongs." But no other contracts will be ordered to be specifically enforced where the customary equitable factors are absent. Other portions of that report, previously quoted, state that the purpose of the Act was to get rid of the effects of the earlier judicial hostility to arbitration contracts. To interpret the Act as precluding equitable considerations when a court is asked to order specific performance is to do far more than that.

[31] Some courts which have interpreted such statutory provisions as requiring an automatic granting of specific performance, have used indirect methods of importing equitable considerations; they have, in order to circumvent that interpretation, resorted to artificial interpretations of the terms of particular arbitration provisions, or narrow constructions of the statutory procedural requirements, etc.

See Phillips, A Lawyer's Approach to Commercial Arbitration, 44 Yale L.J.

(1934) 31, 43; Phillips, The Paradox in Arbitration Law, 46 Harv.L.Rev. (1933) 1258, 1276ff; 6 Williston, Contracts (Rev. ed. 1938) 5366–5377, 5379.

It would seem wiser candidly to hold that the legislature, absent the most explicit language to the contrary, cannot have meant equity to act without being equity.

[32] Those sponsors of arbitration who insist that the valuable traditional powers of the equity courts are choked off under provisions like Section 4 are doing arbitration no real service. For where their position has been accepted, litigation—which the arbitration statutes are designed to reduce—is augmented.

The more enthusiastic of those sponsors have thought of arbitration as a universal panacea. We doubt whether it will cure corns or bring general beatitude. Few panaceas work as well as advertised. Almost always those who propose one think solely of the disadvantages of an older method which they criticize, forget its advantages, and disregard evils which may attend the reform.

action until such arbitration has been had in accordance with the terms of the agreement.' We think the Court of Appeals was clearly right in concluding that there is no reason to imply that the power to grant a stay is conditioned upon the existence of power to compel arbitration in accordance with section 4 of the act. * * * There is * * * strong reason for construing the clause as permitting the federal court to order a stay even when it cannot compel the arbitration."

In the case at bar, so far as the arbitration was concerned, it was the first duty of the court, under Section 3, to determine whether there was an agreement to arbitrate and whether any of the issues raised in the suit were within the reach of that agreement. The appellant contested the existence of the charter party which contained that agreement, but also alternatively[33] pleaded that, if it existed, then there should be a stay pending arbitration of the appropriate issues. We see no reason why a respondent should be precluded from thus pleading in the alternative.

It is suggested, however, that there is a difference in the position of (1) a defendant who, even if he has no excuse to offer, refuses wholly to perform a contract containing an arbitration clause which he sets up as a condition precedent and (2) one who, like appellant, defends on the ground that no contract was ever made and, alternatively, similarly sets up an arbitration clause. The latter, it is urged, is somehow guilty of a greater moral wrong and, therefore, entitled to less relief. We cannot agree. For we have already shown that equitable factors have slighter bearing where defendant asks a stay under Section 3 and not specific performance under Section 4. But even if such factors were fully pertinent under Section 3, it would not be true that there is more equity in the position of a person who, admitting that he has made a contract, wilfully refuses all performance without excuse than in that of one who, in good faith, raises a question of fact as to whether a contract was ever made.[34] As Williston remarks:[35] "A person who repudiates a contract wrongfully cannot sue upon it himself, but if he is sued upon it, he can be held liable only according to the terms of the contract. If, therefore, an arbitration clause amounts to a condition precedent to the defendant's promise to pay any insurance money, and such conditions are lawful, the defendant can be held liable only if that condition is performed, prevented or waived."

Arbitration under the charter party here was a condition precedent. At common law, or in admiralty, failure of a plaintiff to perform an ordinary condition precedent (unless excused) is the basis of a plea in bar. As we observed, wide executory arbitration clauses, owing to judicial opposition to arbitrations, were not dealt with in similar manner, although more limited executory arbitration provisions were. Cf. Hamilton v. Liverpool, etc., Ins. Co., supra. The Arbitration Act has eliminated the hostility to an executory arbitration agreement coming within Section 2 and, while not making it a basis for a plea in bar, now permits it to be made the basis of a stay order.

The arbitration clause here was clearly broad enough to cover the issue of damages; "a clause of general arbitration does not cease to be within the statute when the dispute narrows down to damages alone."[36] It has been suggested that the arbitration clause calls for arbitrators who are "commercial men," that they are not appropriate persons to compute damages in this case where appellant has not merely breached but denied the existence of the charter party, and that, therefore, it must follow that the parties did not contemplate arbitration of such damages. But that argument is untenable, since it rests upon an unsound assumption, i.e., that damages are to be differently computed in those two kinds of situations. In truth, it is precisely this sort of case where arbitration of damages by "commercial men" may be peculiar-

---

33 That is, it tried so to plead in its amended answer. Since we hold that it should have been allowed to amend, we deal with the case as if it had so pleaded.

34 Although we do not disturb the findings of the trial judge, they were based on a record containing conflicting testimony and it cannot be said that appellant was in bad faith in contesting the making of the charter party. Presumably, in so doing, it relied on its counsel, a reputable member of the bar.

35 6 Williston, Contracts (Rev. ed. 1938) Sec. 1921 (pp. 5372–5373).

36 Shanferoke Coal & Supply Corp. v. Westchester S. Corp., 2 Cir., 1934, 70 F.2d 297, 299.

ly useful, as they are likely to be more familiar than the average lawyer who serves as special master with the relevant background of international shipping in the state of world affairs as of the period covered by the charter party.[37]

There remains to be considered the language of Section 3 of the Act that, "on application," such a stay shall be granted "providing the applicant for the stay is not in default in proceeding with such arbitration." We take that proviso to refer to a party who, when requested, has refused to go to arbitration or who has refused to proceed with the hearing before the arbitrators once it has commenced. The appellant was never asked by appellee to proceed with the arbitration; indeed, it is the appellee who has objected to it. In Shanferoke Coal & Supply Corp. v. Westchester S. Corp., 2 Cir., 1934, 70 F.2d 297, plaintiff alleged that defendant, after part performance, materially breached the contract. The defendant in its answer denied the allegations and, as a special defense, set up an arbitration clause in the contract, alleged that it was willing to arbitrate, and moved for a stay under Section 3 of the Arbitration Act. Answering plaintiff's contention that defendant was "in default in proceeding with such arbitration," we held that the fact that defendant may have breached the contract was not a "default" within that statutory provision; we said that the initiative as to proceeding with the arbitration rested upon plaintiff, adding: "If it did not but sued instead, it was itself the party who fell 'in default in proceeding with such arbitration,' not the defendant."[38] Our decision was affirmed in Shanferoke Co. v. Westchester Co., 1935, 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583.

Accordingly, we conclude that the defendant here was not in default within the meaning of the proviso in Section 3. It follows that the district court should have stayed the suit, pending arbitration to determine the damages.

A plaintiff who brought suit on a contract, without seeking to avail himself of its arbitration clause, has been held to have waived his rights thereunder, so that he could not subsequently, after a long delay, ask the court, under Section 3, to stay the action pending arbitration.[39] Within limits, much might perhaps be said for such a holding, on the ground that a party should not thus first set in motion judicial proceedings and then arrest them.[40] But the situation is, ordinarily, different in the case of a defendant who amends his answer to set up the arbitration so as to ask a stay, especially where, as here, no important intervening steps had been taken in the suit and no one had been affected by the delay. In Radiator Specialty Co. v. Cannon Mills, Inc., 4 Cir., 97 F.2d 318, 117 A.L.R. 299, the defendant, when sued in the amount of $4,340 on a contract containing an arbitration clause, filed an answer and also set up a counterclaim of $58,812.60. The case was set for trial, but, after three months, the trial was, on defendant's motion, adjourned on the condition, imposed by the trial court, that the case would be tried on the adjourned date several months later. When the case was then called, both sides having prepared for trial, the defendant, for the first time, moved for a stay, under Section 3 of the Arbitration Act, of the action both on the claim and on its own counterclaim. It was held that the trial court had discretion to deny the stay because there had been a "waiver" by defendant and he was in "default." There the defendant, because of his counterclaim, was in the position of a plaintiff who began suit without seeking arbitration until after a long interval; and the other facts are obviously different from those here.

Our conclusion is not inconsistent with our decision in The Wilja, 2 Cir., 1940, 113 F.2d 646, properly interpreted. There is a dictum in that opinion intimating that there was a "repudiation of the contract" which nullified the arbitration clause, because the respondent shipowner had com-

---

[37] The chartered vessel here was to travel from New York to the Orient.

[38] In line with this interpretation, we directed that the stay be granted but said that "the District Court will be free * * * to vacate it at any time, should it appear that the defendant is in default in proceeding with the arbitration."

[39] Rederiaktieselskabet Nidaros v. Steamship Owners Operating Co., D.C., 25 F.Supp. 663; La Nacional Platanera v. North American F. & S. S. Corp., 5 Cir., 84 F.2d 881; cf. The Quarrington Court, D.C., 25 F.Supp. 605.

[40] Such conduct might be improper, if the plaintiff wants to avail himself of provisional remedies not available in aid of the arbitration.

pletely refused performance, so that it could not ask for a stay based on that clause. But the facts of that case were that, due to war conditions, it had become impossible to carry out the arbitration, which, by its terms, was to take place in London. Moreover, there the libellant, under what came close to being coercion on the part of respondent,[40a] had agreed to an amendment of the original contract increasing the freight rates to twice the amount originally agreed upon; and respondent had then flagrantly breached even this amended contract. There was thus the impossibility of complying with the arbitration clause coupled with impressive unfairness by respondent. It is true that some conditions precedent will not be excused merely because of the impossibility of complying with them; but, in a variety of circumstances, the courts have held that impossibility will obviate non-compliance.

The rulings in those cases turn largely on the particular facts involved.[41] In some of those cases, it has been said that the parties did not contemplate the contingency which subsequently frustrated compliance with the condition, and, therefore, could not have intended to insist on the condition in such unforeseen circumstances. The use of such an explanation arose in a period when the courts were over-emphasizing the consensual element in all phases of life and unwilling to admit that a contract may create a status to which the courts will attach obligations, never in the minds of the parties, but based upon a policy which involves fair dealing.[42] Williston and others have sensibly urged a more candid avowal that it is such a policy, judicially imposed, and not at all what the parties intended which, in some situations, excuses non-compliance with a condition precedent when it becomes impossible.[43]

[40a] Cf. United States Navigation Co. v. Black Diamond Lines, 2 Cir., January 5, 1942, 124 F.2d 508; Union Pac. R. R. Co. v. Public Serv. Comm., 248 U. S. 67, 70, 39 S.Ct. 24, 63 L.Ed. 131; Lonergan v. Buford, 148 U.S. 581, 589–591, 13 S.Ct. 684, 37 L.Ed. 569; Dawson, Economic Duress and Fair Exchange in French and German Law, 11 Tulane L.Rev. (1937) 345; 12 Id. (1937) 43; Goebel, Trends in The Theory of Contracts in The United States, 11 Tulane L. Rev. (1937) 413; Havighurst, Consideration, Ethics and Administration, 42 Col. L.Rev. (1942) 1; United States v. Butler, 297 U.S. 1, 71, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914.

[41] See, e. g., Hamilton v. Liverpool, etc., Ins. Co., 136 U.S. 242, 255, 10 S.Ct. 945, 34 L.Ed. 419; Insurance Companies v. Boykin, 12 Wall. 433, 436, 20 L.Ed. 442; 6 Williston, Contracts (Rev. ed. 1938) §§ 794, 795, 799, 806.

[42] Cf. Dermott v. State, 1885, 99 N.Y. 101, 109, 1 N.E. 242; King v. Leighton, 1885, 100 N.Y. 386, 391, 3 N.E. 594; Genet v. President, etc., D. & H. Co., 1893, 136 N.Y. 593, 609, 32 N.E. 1078, 19 L.R.A. 127.

Cf. Holmes, J., in Globe Refining Co. v. Landa Cotton Oil Co., 1903, 190 U. S. 540, 543, 23 S.Ct. 754, 47 L.Ed. 1171 with his reference to "the humbug of talking about the intention of the parties" in a letter written in 1923, published in Holmes, Collected Book Notices, etc. (ed. by Shriver 1936), 172.

[43] In 6 Williston, Contracts (Rev. ed. 1938) § 806 (pp. 2262–2263) it is said: "When courts hold a promisor liable in spite of the nonperformance of a condi-

tion which the promisor himself has not prevented from happening, they generally purport to reach the results which they achieve by interpretation of the contract, but they are unquestionably doing something more than ascertaining the meaning of the language which the parties use. They are disregarding the condition altogether, in spite of the fact that as a matter of English its meaning is perfectly plain, because the particular contingency which has arisen, though the language of the contract is wide enough to include it, was presumably not intended by the parties to be covered. This inference is often drawn where the only reason the court has for supposing that the parties did not have in mind the contingency is that the terms of the contract if literally applied produce a harsh and unreasonable result * * * Very likely this is true, but the reason which leads the court to believe it is true is not anything in the language of the condition— the meaning of the words is perfectly plain. What influences the court is the fact that it is so unfair and harsh to make the condition applicable in view of the situation which has arisen, that the belief is reasonable. Where language is of doubtful meaning, unquestionably a fair meaning rather than a harsh one is properly chosen on ordinary principles of interpretation. It is reasonable to suppose in such a case that the parties meant what was fair rather than what was not. Where, however, the language of the contract is not ambiguous, and the court refuses to apply it in a particular instance because it works hardship, the court under the disguise of interpretation

Lord Sumner, in speaking of a related doctrine, said: "It is irrespective of the individuals concerned, their temperaments and failings, their interest and circumstances. It is really a device, by which the rules as to absolute contracts are reconciled with a special exception which justice demands." Hirji Mulji v. Cheong Yue S. Co., [1926] A.C. 495, 510. Williston suggests that, in speaking of the doctrine of dependent promises, courts, when imputing an intention to the parties where none exists, are employing "an obvious fiction" and it is "better to drop any talk about intention of the parties where they express none and rest" such doctrines "solely on their fairness—a quite sufficient basis." Cf. Parev Products Co. Inc., v. I. Rokeach & Sons, Inc., 2 Cir., December 24, 1941, 124 F.2d 147; United States v. Forness, 2 Cir., January 20, 1942, 125 F.2d 928, note 25; Hume v. Moore-McCormack Lines, 2 Cir., 1941, 121 F.2d 336, 342, 343 and notes 18–22. We do not say that impossibility will always excuse non-compliance with an arbitration clause, but merely that it did in The Wilja, on the facts there present.

The use of the phrase "repudiation of the contract" in connection with the application of arbitration clauses came into vogue beginning with Jureidini v. National British & Irish Millers, Ins. Co., Ltd., [1915] A.C. 499. There a policy provided (1) that if the claim were fraudulent or the loss were caused by the wilful act of the insured, all benefit under the policy should be forfeited; (2) that if any difference arose as to the amounts of any loss, such difference should, independently of all other questions, be referred to arbitration, and that it should be a condition precedent to any right of action upon the policy that the award of the arbitrator of the amount of the loss, if disputed,

should first be obtained. A loss occurred, but the defendant insurance company notified the plaintiff that it would not admit the claim on account of fraud and arson. When sued, the defendant pleaded (1) that the claim was fraudulent and (2) that there had been no compliance with the arbitration clause.[44] At the trial, the jury found that there was no fraud or arson, and the court assessed the damages and entered judgment against the defendant. The House of Lords, on appeal, sustained the judgment, Lord Haldane saying that the arbitration clause was inapplicable, as the defendant had "repudiated the claim altogether." Lord Dunedin, however, remarked (p. 507), "Personally I should rather like to reserve my opinion as to what would have been the effect if the respondents, instead of pleading as they did, had pled in this way: 'We will allow this question to be disposed of at law by a jury as to whether there was fraud or arson or not,' and had gone on to say, 'but in the event of that being negatived, we wish this ascertainment of actual damage to be ascertained by arbitration.' I should like to reserve my opinion on whether they might have said so with effect."

The Jureidini case has been criticized by Williston.[45] In a subsequent case, in 1922, Lord Dunedin endeavored to explain it on the ground that there the particular arbitration clause was not sufficiently broad to cover the controversy. See Sanderson & Son v. Armour & Co., (1922) S.C. (H.L.) 117.[46] The latter case, however, involving Scotch law—never hostile to executory arbitrations—serves to show that the true explanation of the Jureidini case is the continuance in the English courts of their old unfriendliness; see the differentiation, on that ground, in the Sanderson & Son case, of an earlier decision, Municipal Council of Johannesburg v. D. Stewart &

---

is in fact giving relief from the terms of the contract on principles analogous to those which have influenced courts of equity in relieving from forfeiture * * * " Cf. Williston, loc. cit., § 615 (pp. 1768–1769), § 825 (pp. 2312–2313); Langdell, Summary of Contracts (2d ed.) § 105.

Of course, effect will usually be given to a provision in a contract making it undeniably clear that the condition precedent is not to be excused because of impossibility of compliance. Cf. Williston, loc. cit., § 811; Pollock, Contracts (10th ed.) 262, 275–276.

[44] The English Arbitration statute of 1889 was then in force.

[45] 6 Contracts (Rev. ed. 1938) § 1921, p. 5372.

[46] There the plaintiff, because of an alleged material breach by the defendant, "rescinded the contract" under the Sale of Goods Act, and sued in a Scotch Court for damages. The defendant pleaded an arbitration clause, reading: "any dispute on this contract shall be settled by arbitration, in the usual way." On appeal, the House of Lords held that, under Scotch law, the arbitration clause was effective.

Co., (1909) S.C. (H.L.) 53. Our Arbitration Act should, we think, be regarded as a direction to us to forget the English attitude; we may, therefore, be guided by the spirit of the Scotch rather than by that of the English decisions.

The phrase "repudiation of the contract," as used by Lord Haldane in the Jureidini case, was incidentally referred to in The Atlanten, 1920, 252 U.S. 313, 40 S.Ct. 332, 64 L.Ed. 586, which arose before the enactment of the Arbitration Act of 1925. That was a suit against a Swedish corporation, owner of a steamship, for a breach of a charter party made in Denmark. Before any voyage was made, the owner refused to perform, and, when sued, set up the arbitration clause of the agreement which read: "If any dispute arises the same to be settled by two referees, one to be appointed by the Captain and one by charterers or their agents, and if necessary, the arbitrators to appoint an Umpire." It was alleged that by the laws of Denmark and Sweden such a provision was binding as an effective condition precedent.[47] The court said that the refusal to perform "was not a 'dispute' of the kind referred to in the arbitration clause" because "the withdrawal was before the voyage began and it is absurd to suppose that the captain, who might be anywhere in the world, was to be looked up and to pick an arbitrator in such a case." Due to that fact—the provision for selection of an arbitrator by the captain—the court said, "The clause obviously referred to disputes that might arise while the parties were trying to go on with the execution of the contract," and added, "not to a repudiation of the substance of the contract, as it is put by Lord Haldane in Jureidini v. National British & Irish Millers Co., Ltd., [1915] A.C. 499, 505." That reference to the Jureidini case was thus made merely in passing, and was not at all necessary to the court's reasoning or decision. The Atlanten, then, turned on the construction of the particular arbitration clause involved in that case which was markedly different from that we have before us in the case at bar. In Shanferoke

Coal & Supply Corp. v. Westchester S. Corp., 2 Cir., 1934, 70 F.2d 297, 299 affirmed 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583, in which we discussed and applied the Arbitration Act of 1925,[48] we expressly said that we were leaving open the question whether the "repudiation" idea expressed in the Jureidini case was correct.

The order of the district court is reversed and the cause is remanded with directions to proceed in accordance with the foregoing opinion.

---

[47] The court said (252 U.S. at page 315, 40 S.Ct. at page 333, 64 L.Ed. 586), "With regard to the arbitration clause we shall not consider the general question whether a greater effect should not be given to such clauses than formerly was done, since it is not necessary to do so in order to decide the case before us."

[48] See In re Utility Oil Corporation, 2 Cir., 1934, 69 F.2d 524, 525, 526, certiorari denied Petroleum Nav. Co. v. Utility Oil Corporation, 292 U.S. 655, 54 S.Ct. 866, 78 L.Ed. 1504, where we intimated that The Atlanten should perhaps be reconsidered in the light of the subsequent enactment of the Arbitration Act.