G. B. MICHAEL and Genossenschaft-
kraftfutterwerk, a corporation,
Plaintiffs,

v.

SS THANASIS, her engines, boilers, etc.;
Thenamaris Corporation, a corporation;
Doe Corporation, a corporation; Doe
Company, a partnership; and John Doe,
Defendants.

Civ. No. 47530.

United States District Court,
N. D. California.

March 2, 1970.

George L. Waddell, Harvey I. Wittenberg, Dorr, Cooper & Hays, San Francisco, Cal., for plaintiffs.

D. Thomas McCune, Lillick, McHose, Wheat, Adams & Charles, San Francisco, Cal., for defendants.

GERALD S. LEVIN, District Judge.

This is a maritime cause of action within the meaning of Rule 9(h), Federal Rules of Civil Procedure, brought *in rem* and *in personam* for alleged damage to cargo. Jurisdiction is conferred upon this court by 28 U.S.C. § 1333.

The plaintiffs are German citizens and the named defendants are, respectively, a Liberian flag vessel and her owner, a Panamanian corporation. Plaintiffs claim to have been the owners of certain cargoes of copra intended for carriage from the Philippines to Germany which allegedly sustained damage by reason of fire while on board the THANASIS in the Philippines.

For the voyage in question, the THANASIS was under charter from her owner to Filipinas Compania de Navegacion, S.A. This charter party was executed in England and includes *inter alia* the following provisions:

Arbitration Clause. 40. If any dispute or difference should arise under this Charter, same to be referred to three (3) parties in the City of LONDON one to be appointed by each of the parties hereto, and the third by the two so chosen and their decision, or that of any two of them, shall be binding and final, and this agreement may, for enforcing, be made a rule of the Court.

U.S.A. Clause Paramount. 48. The carriage hereunder and all bills of lading issued shall be deemed subject to and to have incorporated the following clause. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein. * * *

Plaintiffs allege that they are the bona fide purchasers of certain bills of lading issued in conjunction with said charter party and concerning the shipment of copra alleged to have been damaged. These bills of lading are denominated MAN-6, MAN-7, and MAN-8. Each such bill is under the heading,

BILL OF LADING

(Loading under Charter Party)

and each such bill includes *inter alia* the following provisions:

Except as otherwise stated herein and in the Charter Party, this Contract shall be governed by the laws of the Flag of the Ship carrying the Goods.

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States which shall be deemed to be incorporated herein.

All terms, conditions and exceptions of Charter Party dated SEPTEMBER 8, 1966 shall considered [sic] as embodied in this Bill of Lading. In the event of any conflict between this Bill of Lading and the Charter Party, the latter shall control.

The complaint herein was filed on July 28, 1967. Admiralty process was issued against the THANASIS, and she was ar-

rested and taken into custody by the United States Marshal. In order to obtain the release of the vessel the owners protection and indemnity underwriters authorized the issuance of a letter of undertaking agreeing to pay and satisfy any final decree of the court in an amount not exceeding $100,000.00 plus interest and costs, or any lesser amount settled between the parties without final decree being entered.

Defendants now seek to enforce the arbitration provision in the charter party with respect to settling the dispute arising from plaintiffs' claim of damage to the copra cargoes. Accordingly, defendants have moved this court to stay proceedings pending arbitration of the matter. Plaintiffs oppose this motion.

### I. *Incorporation by Reference*

The initial questions raised by defendants' motion for a stay are *first*, whether the bills of lading effectively incorporated by reference the provisions of the charter party, including the arbitration clause, and *second*, if such incorporation were effective, did it also include implicit incorporation of the law governing the charter party in addition to the explicit incorporation of the terms of the charter party itself.

In construing the terms of the charter party and of the bills of lading, and both of them together, it is well established that the principles of construc-tion applicable to ordinary commercial contracts apply here as well.[1] Thus a bill of lading will legally incorporate an arbitration provision of a charter party and be subject thereto when the charter party is clearly referred to in the bill of lading and this fact is or should be known to the holder of the bill. See Lowry & Co. v. S. S. Nadir, 223 F.Supp. 871 (S.D.N.Y. 1963); Poor on Charter Parties and Ocean Bills of Lading § 26, at 71, 73 (5th ed. 1968)[2] [hereinafter cited as Poor].

In the leading case of Son Shipping Co. v. De Fosse & Tanghe, 199 F.2d 687, at 688 (2d Cir. 1952), the court said:

> Where terms of the charter party are, as here, expressly incorporated into the bills of lading they are a part of the contract of carriage and are binding upon those making claim for damages for breach of that contract just as they would be if the dispute were between the charterer and the shipowner. [Citing cases.]

The court regards this as a correct statement of the law and to be applied in the case before the court. Here, there seems little doubt that the charter party was amply and clearly referred to in the bills of lading and that this fact was or should have been known to the plaintiffs. Not only did each bill of lading include the words, "Loading under Charter Party," at the top of the form, but each bill also made specific reference in its body to the fact that the bill was to be subject to and incorporate the terms of the

---

1. Charter parties are contracts, 1 Benedict on Admiralty § 66, at 135 (6th ed. Knauth 1940) [hereinafter cited as Benedict]; Gilmore & Black, The Law of Admiralty § 1–6, at 14, § 4–1, at 172 (1957) [hereinafter cited as Gilmore & Black], as are bills of lading. Poor § 59, at 134; Benedict § 66, at 135; Gilmore & Black § 1–6, at 14.

2. In Lowry & Co. v. S.S. LeMoyne D'Iberville, 253 F.Supp. 396, at 398–399 (S.D. N.Y.1966), appeal dismissed, 372 F.2d 123 (2d Cir. 1967), the court expressed this proposition as follows:

 It is not necessary, in order to incorporate by reference the terms of another document, that such purpose be stated in haec verba or that any particular language be used. "[A]rbitration clauses are to be treated like any other contract provisions," [footnote omitted] and it is settled doctrine that a reference in a contract to another writing, sufficiently described, incorporates that writing [footnote omitted]. Indeed, the very language used here—"as per charter party"—has previously been held sufficiently explicit to incorporate a charter party into a bill of lading [footnote omitted].

 But see Instituto Cubano De Estabiliza-con Del. Azucar v. The Golden West, 128 F.Supp. 754, 756 (S.D.N.Y.1955), aff'd, 246 F.2d 802 (2d Cir. 1957), cert. den., 355 U.S. 884, 78 S.Ct. 152, 2 L.Ed. 2d 114 (1957).

charter party. The paper embodying each bill of lading was not so long or abstruse as to raise a reasonable doubt that plaintiffs were not aware of its terms, nor were the references to the incorporation of the charter party made inconspicuous by the use of small type or other such device. Indeed, the references to the charter party appearing in each bill of lading are among the most salient provisions of the bill to even the most cursory reader.

The court notes, too, that there has been no showing that the plaintiffs are unfamiliar with maritime procedures or other common commercial transactions. This fact alone would distinguish the present case from those instances where an unwitting and ingenuous individual is "hoodwinked" into signing a document the contents of which he is patently unfamiliar or unaware. This is not to say that the parties were necessarily in equal bargaining position or possessed of equal expertise in the matter of shipping procedures and maritime law, but only that it is reasonable under the circumstances here to assume that the plaintiffs were aware or should have been aware of the provisions in the bills of lading which they purchased.

■ Accordingly, we answer the first question raised above in the affirmative, and find that the charter party, including the provision for arbitration, was validly incorporated and became a part of the subject bills of lading and thereby bound both parties to arbitration consistent therewith if either or both so opted.

Deciding as we do, that the provision respecting arbitration was effectively incorporated into the bills of lading, we are still met with the second problem raised above: does incorporation include only those provisions explicitly described in the charter party, or does such incorporation extend as well to such implicit, but unexpressed factors, as the law governing the making of the charter party itself. Expressed more succinctly, the question is *how much* is incorporated in an incorporation by reference of a charter party into a bill of lading.

■ An examination of the relevant authority, the probable intent of the parties, and the practical considerations underlying the commercial transactions involved here lead us to the conclusion that the law governing the execution of the charter party is not to be deemed incorporated into the bills of lading, there being an absence of any specific provision in either the charter party or the bills of lading so providing. It follows, therefore, that the applicable law to be used in construing the arbitration provision of the charter party is that law governing the execution of the bills of lading rather than that governing the charter party.

Plaintiffs have argued strenuously that their claim is not one subject to arbitration and base their contention on the following syllogism:

(1) The provisions of a charter party are to be construed in accordance with the law of the place where the charter party is executed;

(2) The charter party herein was executed in England and is therefore to be construed according to English law;

(3) The claim made here for cargo damage is not one which would be arbitrable under English law;

(4) Therefore, since the bills of lading effectively incorporated the provisions of the charter party, the bills must be governed by English law, and consequently the claim for cargo damage must be entertained by the court rather than settled by arbitration.

Although we have no quarrel with premises (1) [3] and (2) [4], and without regard to the validity of premise (3) [discussed later in this opinion, see pages 178–

---

3. Fox v. The Giuseppe Mazzini, 110 F. Supp. 212, 214 (E.D.N.Y.1953); Arnold Bernstein Shipping Co. v. Tidewater Com'l Co., 84 F.Supp. 948, 951 (D.Md. 1949). See generally Note, Ocean Bills of Lading and Some Problems of Conflict of Laws, 58 Colum.L.Rev. 212, 216 (1958).

4. *Fox, supra,* 110 F.Supp. at 213–214.

181], we are nonetheless of the opinion that the conclusion, (4), does not necessarily follow and that the arbitration provisions are *not* to be construed in accordance with English law.

■■ While incorporation by reference is a common and often necessary commercial device,[5] it is still to be judged in accordance with basic principles of contract interpretation and fairness to the parties. Such fairness dictates that where a reference is made in a bill of lading to provisions in a charter party for particular and specified purposes, the charter becomes a part of the contract evidenced by the bill of lading only for such specified purpose and only to the extent of the reference. See 17A C.J.S. Contracts § 299, at 137, and cases cited therein; 12 Cal.Jur.2d Contracts § 134, at 347–348; Whitman, *op. cit. supra,* at 8.[6]

■ No provision appears in either the charter party or the bills of lading herein calling for English law to govern arbitration respecting disputes arising from claimed damage to cargo. Therefore it follows from the principle of construction just expressed that we will not incorporate for the parties that which was not in fact explicitly incorporated, and we are not bound to conclude that an implicit incorporation calling for the application of English law is to be made.

## II. *Governing Law*

Having determined that the applicable law for construing the arbitration provision is that governing the bills of lading, we are still left with several possible choices as to which law to apply. There being no clear expression of the intent of the parties on this matter, the possible choices are:[7]

(1) The Law of the Philippines (the place where the contract was made—i. e., where the bills of lading were executed; the place where the alleged damage occurred; and the place having the most numerous and significant contacts with the matters herein);

(2) The Law of Liberia (that of the flag of the ship THANASIS, and that which was provided for in the bills of lading as applying to residual matters not otherwise covered);

(3) The Law of United States (that referred to in the bills of lading through the explicit incorporation of the United States Carriage of Goods by Sea Act[8] [Cogsa], and that which is the law of the forum).

No matter which of the above bodies of law is applied, however, the same result ensues: the plaintiffs' claim is an arbitrable one.

■ Absent the provision in the bills of lading for the application of the law of the flag of the ship carrying the goods, the law of the Philippines would be the one most likely and rightly to be applied. Were this the case, we would nonetheless decide the matters before us with reference to the law of the United States, not that of the Philippines. The law of a foreign country is not a matter of which this court is authorized to take judicial notice. Rather, it is a fact, and like other facts must be pleaded and proved. Walton v. Arabian American Oil Company, 233 F.2d 541, 543 (2d Cir. 1956), cert. den. 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956); Blumenthal Import Corp. v. Thos. & Jno. Brockle-

5. See Gilmore & Black § 3–15, at 109, § 4–1, at 172; Whitman, Incorporation by Reference in Commercial Contracts, 21 Md.L.Rev. 1 (1961).

6. To the extent that the relevant instruments herein partake of the character of "adhesion" contracts, see Ehrenzweig, Adhesion Contracts in the Conflict of Law, 53 Colum.L.Rev. 1072, 1075; 16 Am.

Jur.2d Conflict of Laws § 46, at 74–75. Cf. Enclyclopaedia Brittanica, Inc. v. SS Hong Kong Producer, 2 Cir., 422 F. 2d 7 (Oct. 30, 1969).

7. The generally accepted theories used in determining the law governing the construction of a bill of lading are set out in 58 Colum.L.Rev., *op. cit. supra.*

8. 46 U.S.C. § 1300 et seq.

bank, 148 F.2d 727, 728 (3d Cir. 1945); The Hanna Neilson, 25 F.2d 984, 987 (W.D.Wash.1928); The Matterhorn, 128 F. 863, 864 (9th Cir. 1904); 9 Wigmore on Evidence § 2536, at 492 (3d ed. 1940) [hereinafter cited as Wigmore]. See generally 75 A.L.R.2d 529, Annot.: Law of Foreign Country Presumption. Cf.

Cuba R. R. Co. v. Crosby, 222 U.S. 473, 479, 32 S.Ct. 132, 56 L.Ed. 274 (1912).[9] Since the law of the Philippines has been neither pleaded nor proved, even were it applicable, we would be obliged to decide this case in accordance with American law under either of two accepted theories.[10]

9. Some commentators recognize an exception to this rule when dealing with general admiralty law, presumed to be the same throughout the world, rather than with foreign law not of general acceptance. 3 Benedict § 382, at 11; 9 Wigmore § 2573, at 555.

10. The first generally accepted view is to indulge in the presumption, often unwarranted and lately criticized by some commentators, that foreign law, where not proven to the court's satisfaction, is identical to the law of the forum. See 1700 Ocean Avenue Corporation v. GBR Associates, 354 F.2d 993, 994 (9th Cir. 1965); The Arizpa, 63 F.2d 42, 43 (4th Cir. 1933); The Hanna Nielson, supra; 75 A.L.R.2d 529, supra, at 536–638.

The other major view dispenses with the presumption and proceeds on the rule that the law of the forum is always the starting place in a conflict of laws situation, and that forum law is to govern unless the court is satisfied that some other (foreign) law should displace it. Seguros Tepeyac, S.A., Compania Mexicana de Seguros Generales v. Bostrom, 347 F.2d 168, 174 n. 3 (5th Cir. 1965); Ehrenzweig on Conflict of Laws 311 (1962); 1 Edelman, Maritime Injury and Death 534 (1960); 75 A.L.R.2d 529, supra, at 539–541. This position was analyzed at some length by one of America's leading commentators in the area of conflicts of law, a portion of which is worth repeating here.

Notwithstanding any foreign laws allegedly "governing" the case, American courts have, in literally hundreds and perhaps thousands of decisions, applied their own law, in reliance on the often obviously unrealistic principle that the foreign law not properly pleaded or proved may be presumed to be identical with the law of the forum. Only rarely have courts assumed an independent conflicts rule calling in such cases for the application of that law as such.

The indispensability of such a rule is demonstrated by those few but unluckily highly authoritative decisions in which suits have been dismissed on the ground that the "governing" law had not been established. When it is rec-

ognized, and only when it is recognized, that the law of the forum as the Basic Rule is entitled to application at the outset unless displaced by a more appropriate law invoked by either party can the authority of such unfortunate decisions permanently be discounted. (Ehrenzweig, The Lex Fori-Basic Rule in the Conflict of Laws, 58 Mich.L.Rev. 637, 678–679 (1960).)

Following this approach, it is possible to harmonize three seemingly irreconcilable cases which form the leading expressions in the Ninth Circuit on the question of the recognition (or non-recognition) of foreign law. The first case, Philp v. Marci, 261 F.2d 945, 75 A.L.R.2d 523 (9th Cir. 1958), denied plaintiff's cause of action for slander under the applicable law of Peru, since such law had been neither pleaded nor proved. The court there said, "We do not presume that the law of defamation in Peru is the same as the law of defamation in the State of Washington [the forum state for the case]." (261 F.2d 948).

In San Rafael Compania Naviera, S.A. v. American Smelt. & R. Co., 327 F.2d 581 (9th Cir. 1964), the court was faced with a case involving commercial shipments with contacts in Peru, Washington, and California. After discussing the facts of the case, the court concluded that,

If we look to the lex loci contractus, that of Peru * * * we are met with the fact that nobody made any attempt to show what the law may be. Under these circumstances, it is presumed to be the same as the law of the forum, i. e., California. (327 F.2d at 587.)

In the third case, 1700 Ocean Avenue Corporation, supra, 354 at 994, the court said:

In the absence of a showing at the trial that some other law than that of the forum was applicable, and proof of it, the presumption would be that the foreign law, if applicable, would be the same as California's. [Citing cases.]

If these three cases are viewed without an unifying principle, it appears as though the proposition expressed in Philp was overruled sub silentio in San Rafael Compania and 1700 Ocean Avenue. Al-

 The better route, however, is to give effect to the choice of law indicated in the bills of lading and thus defer to the "laws of the Flag of the Ship carrying the Goods"—Liberia. Parties to a contract are free, within certain limitations not important here,[11] to choose their own governing law and have the same enforced by a court. The "law of the flag" is a choice of law theory peculiar to maritime law, but it is one of the widely accepted rules governing maritime transactions. See Sinclair, Conflict of Law Problems in Admiralty, 15 Sw.L.Rev. 207, 230 (1961); Note, Ocean Bills of Lading, *op. cit. supra.* Cf. Markakis v. Liberian S/S the Mparmpa Christos, 161 F.Supp. 487, 504 (S.D.N.Y. 1958), rev'd on other grounds, 267 F.2d 926 (2d Cir. 1959); Giatilis v. The Darnie, 171 F.Supp. 751 (D.Md.1959).

 Even if the court accepts Liberian law as that governing the issues before the court, the result will still be the same as though American law were applied. This is because the failure to plead and prove Liberian law would lead the court back to the law of America, whether by the *"lex fori"* or "presumption" route.[12] Furthermore, although as noted the parties have not presented any evidence of the law of Liberia, the court's own research leads to the conclusion that the substantive law of Liberia regarding the matters under consideration is *in fact* similar to the law of America.

Thus in Sfiridas v. Santa Cecelia Co., S. A., 265 F.Supp. 252, at 254 (E.D.Pa. 1966), the court said;

> Since this [Liberia] adopts the general maritime law of the United States, the Court in that case [Kontos v. The S.S. Sophie C., 184 F.Supp. 835 (E.D. Pa.1960)] could anticipate looking to its own law. Liberian Code of Laws of 1956, Title 22, § 30.

Although little appears in the reported cases concerning the substantive maritime law of Liberia, at least one other authority in the field has concurred in the view just expressed that Liberian law follows the maritime law of the United States. 1 Edelman 536.

Although plaintiffs argue that the resort to American law is unwarranted in view of the fact that neither of the parties nor any of the instruments or occurrences had any contact with America, a reading of the relevant instruments negates that view.

 The charter party gratuitously [13] included a provision making it and all bills of lading issued thereunder

---

though neither of these last two cases cited *Philp* (nor has any other case decided since *Philp*), the facts that (1) both cases were later in time, and (2) *San Rafael Compania,* like *Philp,* dealt specifically with Peruvian law, indicates that the view articulated in *San Rafael Compania* and *1700 Ocean Avenue* is the accepted view in this circuit.

If, however, the unifying principle of the primacy of forum law is interjected, these cases can be harmonized and, we believe, better understood. In each case the result was the same by utilizing, either initially or by "bounceback," the law of the forum. Thus in *Philp* the court was affirming the primacy of forum law by denying a cause of action under a foreign law where the latter had not been proved. Similarly, in *San Rafael Compania* and *1700 Ocean Avenue* the primacy of forum law was also upheld by the presumption that foreign law was the same as the forum's. In this manner,

the three cases can be reconciled under the principle that in each the existence or non-existence of a cause of action was determined with respect to the law of the forum rather than with respect to an unproved foreign law.

11. The most common limitation occurs when the parties choose to litigate in a forum where neither they nor the transaction in question has any contact. This is a reaffirmation of the principle that jurisdiction cannot be conferred merely by the consent of the parties.

12. See discussion in footnote 10, *supra.*

13. Unlike bills of lading for the carriage of goods by sea to or from an American port, charter parties do not by their own force incorporate Cogsa, no matter where issued. 46 U.S.C. § 1305. Gilmore & Black § 3–15, at 108. Thus the original signatories to the charter party herein were under no obligation to include the reference to Cogsa in their instrument.

subject to Cogsa, and the bills of lading likewise incorporated and were made subject to the provisions of Cogsa.[14] In view of this, it ill befits the plaintiffs to contend that the invocation of American law is either unfair or surprising.

### III. *Arbitrability of Claim*

 Under the applicable American maritime law, plaintiffs' claim for damage to cargo is an arbitrable one within the meaning of the arbitration clause of the charter party and incorporated into the bills of lading.

 American law has long and clearly made arbitration a favored mode of resolving commercial and other problems, and as a result courts have taken a liberal attitude towards what subject matter is cognizable in arbitration. See Robert Lawrence Company v. Devonshire Fabrics, Inc., 271 F.2d 402, 410 (2d Cir. 1959); Kulukundis Shipping Co. v. Amtorg Trading Corp., 126 F.2d 978, 985, 988–989 (2d Cir. 1942); Miletic v. Holm & Wonsild, 294 F.Supp. 772, 775–776 (S.D.N.Y.1968); Associated Met. & Min. Corp. v. The Steamship Milhalis Angelos, 234 F.Supp. 236, 237–238 (S.D.N.Y. 1964). Following this approach, American courts have permitted arbitration to proceed on claims of cargo damage under bills of lading pursuant to an arbitration agreement in a charter party and incorporated into the bills of lading. *Son Shipping Co., supra*; *Kulukundis, supra*, 126 F.2d at 988–989. Cf. Gilmore & Black § 4–1, at 173.

Plaintiffs concede that under prevailing American law their claim would be subject to the arbitration clause of the charter party, but they contend that British law, not American, should govern, and that under British law this claim would not be arbitrable.

This contention falls with the court's conclusion that British law is inapplicable here, but even if British law *were* applicable, it is far from clear that the plaintiffs' claim would not be subject to arbitration.

Plaintiffs juxtapose the English case of Thomas and Co. v. Portsea Steamship Company (H.L.), 105 The Law Times Reports 257 (1911) and the scholarly historical treatise of Judge Jerome Frank in the American case of *Kulunkundis Shipping Co., supra,* 126 F.2d at 982–983, to arrive at the following general propositions: first, that the attitude of the English judiciary towards arbitration is one of hostility and second, that in a case such as that before us an English court would regard the matter as within the judicial competence of the court rather than as one subject to arbitration.

With all due respect to the many courts which have accepted these propositions and have followed Judge Frank's learned view on the matter, it appears to this court that the English view towards arbitration may not be so hostile as was one supposed. A close reading of *Thomas and Co.* reveals that the specific question there decided was that an arbitration clause found in a charter party was not found to be applicable (incorporated into) certain bills of lading evidencing a contract for carriage of goods. The court was led to this conclusion by the insufficient references in the bills of lad-

---

14. Bills of lading which evidence a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, are made automatically subject to the provisions of Cogsa. 46 U.S.C. § 1300. Here, however, no carriage to or from American ports was anticipated or involved, so the reference to Cogsa in the subject bills of lading was not required.

At least one court has regarded the reference to Cogsa in a bill of lading as precluding an American court concerned in litigation over such a bill from applying anything besides American law. As the court said in Indussa Corporation v. S.S. Ranborg, 377 F.2d 200, at 203 (2d Cir. 1967):

Such language [in Cogsa] would seem to forbid an American court from a holding that might cause a bill of lading covering an ocean shipment to or from the United States to be subjected to foreign rather than American law in litigation.

ing to the arbitration provision of the charter party. Lord Chancellor Loreburn stated:

> [I]f it is desired to put upon the holders of a bill of lading an obligation to arbitrate because that obligation is stated in the charter-party, it must be done explicitly. (105 L.T.R. at 257.)

In words not necessary to the decision, Lord Chancellor Loreburn had added:

> The arbitration clause is not one that concerns shipment, or carriage, or delivery, or the terms upon which delivery is to be made or taken; it only governs the way of settling disputes between the parties to the charter-party, and disputes arising out of the conditions of the charter-party, not disputes arising out of the bill of lading. (*Id.*) [15]

It is evident, then, that *Thomas and Co.* does *not* stand for the proposition that English courts will not defer to arbitration agreements in appropriate cases nor does it stand for the proposition that under no circumstances could an arbitration agreement in a charter party be made applicable to a claim for cargo damage.[16]

If anything, the thrust of English judicial decisions and legislation since *Thomas and Co.* has been to broaden the scope of arbitration and meliorate the supposed older hostility between the courts and arbitrators. See Ehrenzweig, Conflict of Laws 153 *passim*; The English Arbitration Act of 1950. *Cf. Fox, supra*, 110 F.Supp. at 214:

> However, our courts and the English courts have held that an arbitration clause is to be given the broadest possible interpretation as to subject matter, [citing cases].

In The Tradesman. Societe Anonyme Hersent v. United Towing Co., Ltd., 3 All England Law Reports 611 (1961), the question before the court was the enforcibility of an arbitration clause under a towage contract between a French plaintiff and an English defendant with respect to a vessel lost at sea. The court granted the defendant's motion for a stay pending arbitration, holding that therefore, the arbitration clause was enforceable and, by virtue of the mandatory terms of the Act of 1950, section 4(2), a stay of proceedings must be granted.[17]

A case most in point in The Merak. T. B. & S. Batchelor & Co., Ltd. (Owners of Cargo on the Merak) v. Owners of S.S. Merak, 1 All E.R. 230 (1965). There a charter party for the carriage of timber included a clause providing that any dispute arising out of the charter party or any bill of lading issued thereunder

---

15. As cited in the opinion of Lord Gorell, the arbitration clause in question was a restrictive one, providing as follows:

 Any dispute or claim arising out of any of the conditions of this charter-party shall be adjusted at the port where it occurs, and the same shall be settled by arbitration. (*Id.* at 258.)

 Lord Gorell likewise found a failure of incorporation, noting particularly that there was a vagueness in the terms of the arbitration clause resulting from the fact that no fixed place for arbitration had been chosen.

 It should be noted that the wording of the arbitration clause in the charter party before us is considerably broader than that before the court in *Thomas and Co.*, and that contrary to the situation there, the instant charter party *does* make numerous references to matters concerning shipment, carriage and the terms upon which delivery is to be made or taken. For these reasons alone, even an English court adhering strictly to the holding in *Thomas and Co.* would not necessarily have to deny arbitration on the facts of the case before us.

16. See footnote 15, *supra*. In Weir & Co. v. Pirie & Co., 3 Commercial Cases 263 (1898), the court found that an arbitration clause in a colliery could be and had been validly incorporated by reference into a charter party issued under the colliery.

17. The power to grant such stays pending arbitration is not disfavored by English courts, but is instead discretionary under the terms of the Arbitration Act of 1950. See The "Elizabeth H", 1 Lloyd's List Law Reports 172 (1962).

was to be referred to arbitration. Under a subcharter certain bills of lading were issued which incorporated the charter party. When certain cargo was later damaged, the court granted a stay of proceedings pending arbitration pursuant to the arbitration clause. The court held that the arbitration clause in the original charter party had been effectively incorporated in and made applicable to the contract evidenced by the bills of lading.

*Thomas and Co.* was relied on by the party opposing the motion, but the several judges who decided the case either distinguished or downplayed the importance of that case.

Sellers, L. J., said:

[A]nd I do not think that Thomas v. Portsea (3) [sic] can be regarded as an authority that a clause to be incorporated must relate to shipment, carriage and delivery and cannot be extended further and cannot provide for arbitration. (1 All E.R. at 233.)

Davies, L. J., concurred:

The main contention of the plaintiffs on this point is that the decision of the House of Lords in Thomas & Co., Ltd. v. Portsea SS Co., Ltd. (6) [sic] is an authority for the proposition that an arbitration clause in a charterparty cannot be incorporated into a bill of lading in this way; but that case does not, in my judgment, support such a wide proposition. (*Id.* at 235.)

\* \* \* \* \* \*

The present clause applies also to any disputes arising out of any bill of lading. That fact, in my judgment, dis-

tinguishes the *Thomas* case (6) [sic] from the present one. (*Id.* at 235.)

Russell, L. J. concluded:

I see no conflict with the decision in Thomas & Co., Ltd. v. Portsea S.S. Co., Ltd. (16) [sic], where the arbitration clause referred *only* to disputes arising under the charterparty. \* \* \* I think that a true view of that case is that it shows that clauses which are directly germane to shipment, carriage and delivery may be incorporated by general words though the fact that they are found in a charterparty may involve a degree of verbal manipulation to fit exactly a bill of lading \* \* \* (*Id.* at 239.)

The clear gloss placed on *Thomas & Co.* by the *Merak* case is a confirmation of the power of an English court to uphold arbitration and a provision for same in a charter party through incorporation by reference into a bill of lading, so long as the incorporation is explicit.

The failure to appreciate English case law and the changing attitude after *Thomas & Co.* accounts for the opinion of the court in Savannah Sugar Refining Corporation v. SS Hudson Deep, 288 F. Supp. 181 (S.D.N.Y.1968), a case heavily relied on by plaintiffs. *Savannah* concerned the incorporation into a bill of lading of a charter party executed in England and providing for arbitration in London. The court found British law to be governing with respect to the construction of a bill of lading,[18] and held on the authority of *Thomas & Co.* that no arbitration was required on the claim for cargo damage under British law. No mention was made of any other English case before or after *Thomas & Co.* and so we must assume that the court in *Savannah* regarded *Thomas & Co.* as the clear-

18. The court in the *Savannah* case did not indicate where the bill of lading was executed; if it were executed in England, the holding in *Savannah* would be more logical, but would also be a further feature distinguishing that case from the one before us.

In addition, there seems not to have been any real controversy between the

parties as to what the governing law would be. The plaintiff claimed British law was applicable and the defendant appears to have conceded this. The court quoted from a statement by the defendant with regard to the application of British law: "[A]s a matter of substantive law we would not argue too strongly against that stand." (288 F.Supp. at 182.)

est and most dispositive statement of British law on the matter under consideration there. Both the fact that the court in *Savannah* found British law to be controlling (while in the instant case we have determined that the matter is to be governed in accordance with the principles of American law) and the fact that the court seems not to have fully explored the current British attitude towards incorporation of arbitration clauses leads us to reject the holding in *Savannah* as not controlling the case before us.

### IV. *Waiver*

▮ Plaintiffs claim that defendants have waived their right to arbitration by their conduct since the initiation of this suit in 1967. Although dilatory conduct may amount to a waiver of the right to arbitration, such a determination is one to be made by the court based on all the facts surrounding the proceedings before it.

This is not a case where both parties have clearly rejected the arbitration clause and treated it as nonexistent (The Belize, 25 F.Supp. 663, 664 (S.D.N.Y. 1938)); [19] nor where the party seeking arbitration only raised the claim for the first time on the eve of trial (Almacenes Fernandez, S. A. v. Golodetz, 148 F.2d 625, 627, 161 A.L.R. 1420 (2d Cir. 1945)); nor only raised the claim for the first time after submission of the matter on a motion for summary judgment (United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833, 840 (S.D. N.Y.1965)); nor had actually litigated the matter for over five years before expressly raising the question of arbitration (Sulphur Export Corporation v. Carribean Clipper Lines, Inc., 277 F. Supp. 632, 634 (E.D.La.1968)).

The defendants here clearly and explicity raised their claim to arbitration at the very outset of this proceeding by including a request for same in their answer. Courts have specifically held that this factor alone is sufficient to defeat a claim of waiver. Lumbermens Mutual Casualty Co. v. Borden Co., 268 F.Supp. 303, 312 and cases cited therein (S.D. N.Y.1967). See also Robert Lawrence Company, *supra*, 271 F.2d at 413; Kulukundis Shipping Co., *supra*, 126 F.2d at 989; In re Tsakalotos Navigation Corp., 259 F.Supp. 210, 213 (S.D.N.Y.1966).

Defendants have continued to press their claim for arbitration throughout these proceedings, and while significant delay has occurred, it is if anything more the fault of plaintiffs than of defendants and has been occasioned by informal settlement attempts rather than purposeful delay.

▮ Waiver in a situation such as this is not lightly to be inferred, particularly when sought to be raised against the defendant(s). The test of waiver is not inconsistency, but whether the objecting party has been subjected to substantial prejudice. Carcich v. Rederi A/B Nordie, 389 F.2d 692, 696 (2d Cir. 1968); Commercial Metals Co. v. International Union Marine Corp., 294 F. Supp. 570, 573 (S.D.N.Y.1968). See generally 25 A.L.R.3d 1171, Annot.: Arbitration—Delay in Asserting Right. Clearly, the plaintiffs have had ample notice of the defendants' claim to arbitration and have suffered no prejudice other than that occasioned by their own conduct. The finding of the court in Hilti, Inc. v. Oldach, 392 F.2d 368, at 372 (1st Cir. 1968) on similar facts is dispositive of the matter before us and bears repeating here:

> While the district court referred to "nearly two years" of delay, the fact is that the delay preceding the motion to stay was shared almost equally between plaintiff and defendant. [Footnote omitted.] If our analysis is correct, that defendant had legitimate pre-arbitration discovery purposes to pursue, such delay as is occasioned is

---

19. *The Belize* is distinguished thus in Cavac Compania, Etc. v. Board for Val. of German Bonds, 189 F.Supp. 205, 209 (S.D.N.Y.1960) and in Petition of Rop-

ner Shipping Co., 118 F.Supp. 919, 920–921 (S.D.N.Y.1954). Furthermore, in *The Belize* it was the *plaintiff* who requested arbitration.

no basis, in the light of the decided cases in this area, for a finding of default. [Footnote omitted.]

## V. *Forum Non Conveniens*

In addition to their motion for a stay, defendants have also suggested that this court invoke the doctrine of *forum non conveniens* and refuse to accept jurisdiction and thus dismiss the action. This the court declines to do.

 *Forum non conveniens* is a doctrine permitting a court to dismiss an action, although jurisdiction is validly asserted, when in its discretion the convenience of the parties and the ends of justice would be better served were the action entertained in another forum. See Koster v. Lumbermens Mutual Casualty Co., 330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); Canada Malting Co. v. Paterson Co., 285 U.S. 413, 418, 52 S.Ct. 413, 76 L.Ed. 837 (1932); 1 Benedict § 84, at 260.

 The use of *forum non conveniens* is well established [20] and not uncommon [21] in the field of maritime law. The propriety of the doctrine, however, remains open to considerable dispute.[22]

Taking into account the relative convenience of the parties and the best interests of justice, we are convinced that this court should retain jurisdiction in this matter.

The court in Gkiafis v. Steamship Yiosonas, 387 F.2d 460, at 462, 464 (4th Cir. 1967) faced the same question and answered it in a manner with which we are in accord:

Thus, the fact that the law of the flag, the allegiance or domicile of the injured, the allegiance of the defendant shipowner, and the place of contract are all foreign cannot be of controlling importance for the simple reason that such factors furnish a common background upon which the question of discretionary retention of jurisdiction commonly arises. * * *

* * * * * *

Secondly, there is no assurance that Gkiafis would be allowed to present his case to the Greek courts. * * * It is true that Coronado has agreed not to set up the statute of limitations nor to contest jurisdiction in those courts, but jurisdictional questions are in this country not infrequently noticed sua sponte and we cannot assume that it is not so in Greece.[23]

20. Ehrenzweig on Conflict of Laws 123.

21. E. g., Yerostathis v. A. Luisi, Ltd., 380 F.2d 377 (9th Cir. 1967); The Kanto Maru, 112 F.2d 564, 565–566 (9th Cir. 1940); Sherkat Tazamoni Auto Internash v. Hellenic Lines, Limited, 277 F.Supp. 462, 463–464 (S.D.N.Y.1967); Keramiotis v. Basilia Compania Maritima, 176 F.Supp. 269 (S.D.N.Y.1959); Anglo-American Grain Co. v. The S/T Mina D'Amico, 169 F.Supp. 908, 910, 912, 914 (E.D.Va.1959); Poutos v. Mene Grande Oil Co., 123 F.Supp. 577, 578 (S.D.N.Y. 1954); Galban Lobo Trading Co. S/A v. The Diponegoro, 108 F.Supp. 741, 742, 743 (S.D.N.Y.1952); Bulkley, Dunton Paper Co. v. The Rio Salado, 67 F. Supp. 115, 116 (S.D.N.U.1946); Mitsubishi v. Kawasaki, 1960 A.M.C. 151, 152–153 (S.D.Cal.1959).

22. Commentators and students alike have made considerable comment on the nature, necessity of and uses for *forum non conveniens*. E. G., 1 Benedict § 84, at 260–264; Ehrenzweig on Conflict of Laws 123–124; 1 Edelman at 527, 699–700; Gilmore & Black § 1–19, at 46; Ehrenzweig, 58 Mich.L.Rev., *op. cit. supra*, at 679; Bickel, The Doctrine of Forum Non Conveniens as Applied in the Federal Courts in Matters of Admiralty, 35 Corn.L.Q. 12 *passim* (1949); Note, 51 Cal.L.Rev. 632, 636–637 (1963); Comment, Admiralty Suits Involving Foreigners, 31 Tex.L.Rev. 889, 890 *passim* (1953); 90 A.L.R.2d 1109, Annot.: Contract Action—Forum Non Conveniens.

23. Compare the considerations respecting *forum non conveniens* in Odita v. Elder Dempster Lines, Ltd., 286 F.Supp. 547, 551 (S.D.N.Y.1968); Olaf Pederson's Rederi, A/S of Oslo v. Philippine Merch. S.S. Co., 238 F.Supp. 885, 887 (D.Hawaii 1965); Nestle's Products (Malaya) Ltd. v. Osaka Shosen Kaisha and the SS Philippine Maru, 175 F.Supp. 876, 876–877 (S.D.N.Y.1959); The Harfry, 39 F. Supp. 893, 894 (D.N.J.1941).

## VI. *Conclusion*

Pursuant to 9 U.S.C. § 3 this court has the power to stay proceedings where an issue therein is referable to arbitration. This is also the accepted rule with respect to maritime disputes, even where the arbitration is to be in a foreign place. Mannesmann Rohrleitungsbau v. S. S. Bernhard Howaldt, 254 F.Supp. 278, 279 (S.D.N.Y.1965); 1 Benedict § 22a, at 37–38, 294; 4 Benedict § 611, at 190, 191; Poor § 15, at 45.

Accordingly, defendants' motion for a stay pending arbitration is granted; such arbitration to be held in London and governed by applicable law of the United States.

It is so ordered.