**AMOCO OVERSEAS COMPANY,**
Plaintiff,

v.

**S.T. AVENGER, her engines, boilers, etc.,
and Ocean Couriers, Inc.,**
Defendants.

**No. 73 Civ. 4426.**

United States District Court,
S. D. New York.

Jan. 16, 1975.

Haight, Gardner, Poor & Havens, New York City by H. M. Walker, Jr., and Richard A. Corwin, New York City, for plaintiff.

Cardillo & Corbett by Robert V. Corbett, and Christophil B. Costas, New York City, for defendants.

## OPINION

ROBERT J. WARD, District Judge.

Defendants S.T. Avenger ("the Avenger") and its owner Ocean Couriers, Inc. ("Ocean Couriers") renew their motion made pursuant to 9 U.S.C. § 3 for a stay of these proceedings pending determination of the controversy by arbitration. The earlier motion was denied, this Court stating in a memorandum decision dated December 18, 1973 that there was sufficient question concerning the identity of the parties to the arbitration agreements in question to warrant discovery. The renewed motion is supported by answers to interrogatories, transcripts of depositions, and exhibits obtained since that date. For the reasons discussed below, defendants' motion is granted.

This controversy arises from a series of agreements in connection with the transportation in May, 1973 of crude oil from Libya to the Gulf Coast of the United States. Amoco Overseas Oil Co., Inc. ("Overseas") purchased the crude oil through A. Johnson & Co., Inc. for resale to American Oil Company, Inc. (later called Amoco Oil Co., Inc.). Overseas had negotiated a "Contract of Affreightment" dated January 1, 1973 with Amoco Trading International Limited ("ATI"), whereby ATI agreed, as owner or charter-owner of non-U.S. flag tankers, to transport petroleum products for Overseas from foreign ports to Unit-

ed States ports according to specified terms and conditions. In late April and early May, 1973 ATI, through its broker H. Clarkson & Company, Limited, negotiated the fixture of the Avenger, arriving at a firm agreement on May 3. This agreement was confirmed in a letter from the broker to the shipowner on May 4, and embodied in a charter party dated May 3, 1973, but signed by Ocean Couriers on May 14, 1973 and by ATI on some later date. Meanwhile, on May 12, the master of the Avenger signed and issued bills of lading for the cargo, which had already been loaded. During the ensuing voyage both boiler malfunction and an explosion in the pump room disabled the ship, and the voyage was never completed. The cargo was disposed of at a loss. Overseas now sues the ship and its owner for the losses it sustained, its recovery against the charterer ATI being governed by the "Contract of Affreightment" which contains an arbitration clause.

The charter party between ATI and Ocean Couriers likewise contains an arbitration clause.[1] The single question to which this motion is addressed is whether the bill of lading, which governs the rights of Overseas and Ocean Couriers vis-a-vis each other, effectively incorporated the terms of the charter party in such a way that this claim must also be determined by arbitration. The Court concludes that upon the facts of this case, the bill of lading must be read to incorporate the charter party.

The bill of lading, known as a "charter bill," consists of one side of a single sheet of paper, in double spaced large type, and appears the essence of simplicity. It contains blanks which were typed in to identify the consignor, the ship, the master, the cargo, the destination, and the consignee, to whom the cargo was to be delivered upon payment of freight "AS AGREED." It then reads:

"This shipment is carried under and pursuant to the terms of the contract/charter dated —— between MESSRS. OCEAN COURIER INC. and MESSRS. MONTEDISON MILANO AMOCO as charterer, and all the terms whatsoever of the con-

1. The clause reads:

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this Charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

tract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment." There follows a statement of the number of copies issued, the date and master's signature. There are no other clauses which might govern the rights of the shipowner vis-a-vis the cargo owner.

There is apparently no such entity as Messrs. Montedison Milano Amoco. Since the clause quoted above also leaves blank the date of the charter party to which it refers, plaintiff contends that it does not identify the charter party with sufficient specificity effectively to incorporate it into the bill of lading, regardless of what the parties intended. Since there is no confusion whatsoever concerning who in fact was the charterer on this voyage, or which charter party governed the rights of the charterer vis-a-vis the shipowner, and since the documented history of the fixture of the vessel clearly shows that the parties intended the terms of the charter party of May 3, 1973 between ATI and Ocean Couriers to be incorporated into the bill of lading, defendants contend that the language quoted above must be read to accomplish that result. They argue that the absence of the date and the erroneous naming of the charter resulted from the charterer's and plaintiff's own acts in dealing through multiple corporate entities with similar names, in requesting that the fixture not be made public, and in not forwarding the charter party document to Ocean Couriers for signature until after the cargo was already loaded and the bill of lading signed. The Court finds defendants' arguments persuasive.

ATI and Overseas are two of a complex network of corporate affiliates, both American and foreign, doing business under the name "Amoco" and ultimately owned by Standard Oil Company (Indiana) ("Standard"). Included in the network are Amoco Oil Company, a subsidiary of Standard which purchases and distributes petroleum products within the United States, and Amoco International Oil Company ("AIO"), a wholly owned subsidiary of Standard charged with overseeing and controlling all of Amoco's transactions with respect to the purchase, sale, and transportation of crude oil outside North America. AIO, in turn, owns the only outstanding share of Overseas, which is capitalized at $1000, as well as at least 50% of the shares of other European Amoco affiliates. Overseas functions primarily to purchase crude oil for sale to Amoco Oil Company. ATI is owned by two corporations, Amoco International S.A. and Amoco International Limited, which are ultimately owned by Standard. ATI functions to purchase and sell crude oil for distribution outside the United States, but also, pursuant to the "Contract of Affreightment" referred to above, arranges transportation for some of the oil which Overseas purchases and sells. Thus, for example, ATI had purchased oil from A. Johnson, simultaneously with Overseas' purchase of the cargo here, and formalized in the same contract of sale, in addition to acting as charterer for Overseas' shipment.

The method in which this network operates is relevant to the question before the Court. Neither ATI nor Overseas has any employees, and the two corporations operate from the same office space. The work of the corporations is performed by employees of AIO, on loan to one or another of the affiliates, pursuant to a formal employee loan agreement, but on an *ad hoc* basis as a problem arises which is properly within the scope of each respective affiliate. Thus, for example, if a particular purchase of oil is made by Overseas, the appropriate AIO employee will handle it in his capacity as loaned employee to Overseas. But if it is made by ATI the same employee will be on loan instead to ATI. And an employee of AIO handles the transportation arrangements, whether these be for ATI in its own purchases and sales of oil, or for ATI in its capacity as charterer for Overseas' shipments of oil.

To this complex arrangement the oil companies added elements of ambiguity

and secrecy, as they arranged for the transportation of the cargo in question here. The fixture was negotiated through brokers, via telex. The broker for the charterer was under instructions not to reveal the name of his client until making a counter-offer, and at that point merely identified his client as "Account Amoco," requesting that the fixture be kept "strictly private and confidential," to which the broker for the shipowner acceded. The entire negotiations were conducted, agreement reached, and confirming letter sent, with the charterer thus unspecifically identified; only when the formal charter party was forwarded to Ocean Couriers for signature was the charterer specifically named as ATI. The personnel responsible for authorizing fixture on behalf of ATI and for forwarding the necessary information to the ship's master concerning the details of port of loading, destination, consignee, and so forth, were all employees of AIO. As noted above, other employees of AIO had arranged the purchase of the cargo, and the contract of affreightment between ATI and Overseas.

The telex negotiations between the brokers clearly identified the charter party form to be used as "ESSOVOY 1969;" the bill of lading form actually used here is specified and set forth in that charter party. Moreover, the telex messages reflect, as a specific term to be included in the fixture, "GEN ARB NY," and later, "GA AND ARB NEW-YORK." The confirming letter sent by ATI's broker to Ocean Couriers on May 4, 1973, still naming the charterer as simply "Amoco (London)," in abbreviated form specifies as "Charter Party" terms both "Essovoy 69" and "GAA New York." Thus it is clear from the negotiations that the parties intended the bill of lading to incorporate the charter party, and in particular, the arbitration provision. The Court's conclu-

sion in this regard is reinforced by the complete absence of specific terms governing the carriage of the cargo in the bill of lading chosen.

The Court notes that the "Contract of Affreightment" between ATI and Overseas contains as a separate section of "General Provisions" clauses which, with the exception of two provisions in Clause 4, concerning naming loading and discharge ports, are the same as the general clauses of the charter party. The provisions governing the bill of lading are the same in both documents, and although the arbitration clause in the "Contract of Affreightment" does not specifically identify the place of arbitration, it is otherwise identical to that in the charter party. As a result the agreements between ATI and Ocean Couriers, and between Overseas and ATI, are in large part identical to the agreement between Overseas and Ocean Couriers if the bill of lading incorporates the charter party. It is clear to the Court that the parties intended this result.

The information which was filled in by the master in the blanks of the bill of lading issued indicates to the Court that he did attempt, with the information available to him, to effectuate the parties' intention in this respect. He did not leave the clause entirely blank, but properly named the shipowner; he named some Amoco entity, albeit one without a formal corporate existence, as charterer. Since the broker's letter of May 4, 1973 had named only "Amoco (London)" as the charterer, which also has no corporate existence, the Court cannot say that this indicates an intention not to incorporate a charter party.[2] Arrival of the actual charter party for signature by the shipowner only after the bill of lading had been issued may explain the absence of the date in the bill of lading.

---

2. The original complaint in this action was filed under the name of a nonexistent corporate Amoco entity, "Amoco Overseas Company." The Court permitted amendment of the complaint to correct the inaccuracy, but observes that defendants are not alone in their difficulty in correctly identifying the appropriate Amoco corporation.

Against this persuasive evidence of the parties' intent and attempt to incorporate the terms of the charter party into the bill of lading, plaintiff argues that as a matter of law the words actually used in the bill of lading were insufficiently precise to accomplish that result.

Son Shipping Co. v. DeFosse & Tanghe, 199 F.2d 687 (2d Cir. 1952) established that the terms of a charter party may be expressly incorporated into a bill of lading, in such a way that the charterer's and shipowner's agreement to arbitrate "Any and all differences and disputes of whatsoever nature arising out of this charter . . ." may bind the cargo owner in his dispute with the shipowner. 199 F. 2d at 688. Several courts have followed this result in similar cases. Midland Tar Distillers, Inc. v. M/T Lotos, 362 F.Supp. 1311 (S.D.N.Y.1973); Lowry & Co. v. S.S. Le Moyne D'Iberville, 253 F. Supp. 396 (S.D.N.Y.1966), appeal dism. 372 F.2d 123 (2d Cir. 1967); Lowry & Co. v. S.S. Nadir, 223 F.Supp. 871 (S.D. N.Y.1963); Michael v. S.S. Thanasis, 311 F.Supp. 170 (N.D.Cal.1970). The arbitration clause in Midland Tar Distillers, Inc. v. M/T Lotos, *supra*, which was held incorporated into the bill of lading, reads similarly to that at issue here:

> "Any dispute arising in any way whatsoever out of this Charter-Party shall be settled in London, Owners and Charters each appointing an Arbitrator-Merchant or Broker . . ." 362 F.Supp. at 1312.

Courts have reached other results in other cases, where, for example, the arbitration clause in the charter party read "Should any dispute arise between the Disponent Owners and the Charterers, . . ." the matter is to be referred to arbitration. Import Export Steel Corp. v. Mississippi Valley Barge Line Co., 351 F.2d 503 (2d Cir. 1965). There the court reasoned that even were the clause incorporated into the bill of lading it did not bind anyone other than the shipowner and the charterer to arbi-

trate disputes. *See also,* Production Steel Company of Illinois v. S.S. Francois L.D., 294 F.Supp. 200 (S.D.N.Y. 1968). Or, where the charter party's arbitration clause was comprehensive in scope, but none of the blanks in the bill of lading's clause which purported to incorporate the terms of the charter party were filled in, courts have, without looking beyond the face of the bill of lading, refused to read the charter party as a part of the bill of lading. They have held that the failure to include the necessary information reflected an intent not to be bound by the terms of the charter party, or, at a minimum, that the mere existence of a standard incorporation clause, with no data specifying the charter party, was insufficient to effect an incorporation of the charter party into the bill of lading. *See, e. g.,* United States v. Cia Naviera Continental S.A., 202 F.Supp. 698 (S.D.N.Y. 1962); Industria E. Commercio De Minerios, S.A. v. Nova Genuesis Societa Per Azioni Per L'Industria Et Il Commercio Maritimo, 172 F.Supp. 569 (E. D.Va.1959), aff'd 310 F.2d 811 (4th Cir. 1962); and Southwestern Sugar and Molasses Co. v. The Eliza Jane Nicholson, 126 F.Supp. 666 (S.D.N.Y.1954).

In part, this result was required because, as a negotiable instrument, the bill of lading passes into the hands of those who have nothing to do with the charter party, and may not be bound to an agreement of whose terms they have no knowledge or even notice. For this same reason the courts which permit incorporation of the charter party terms into the bill of lading require that the charter party be identified specifically enough to give such meaningful notice to the eventual holders of the bill of lading. *See, e. g.,* Lowry & Co. v. S.S. Nadir, *supra,* 223 F.Supp. at 874; Chilean Nitrate Sales Corp. v. The Nortuna, 128 F.Supp. 938, 940 (S.D.N.Y.1955); Michael v. S.S. Thanasis, *supra,* 311 F. Supp. at 173.

In the case at bar, however, plaintiff and the charterer are so intimately intertwined, with decisions on behalf of

both made by employees of AIO, and the relationship between the two governed in part by the same "Essovoy 69" terms as made up the largest part of the charter party, that the Court cannot find Overseas in its capacity as cargo owner and bill of lading holder to be a stranger to the charter party between ATI and Ocean Couriers. Therefore, in this case it is willing to permit somewhat more ambiguous language to effect incorporation.

■■ The bill of lading, in addition to being a negotiable instrument, is the contract governing the rights of the cargo owner vis-a-vis the shipowner. As such it is to be interpreted according to principles of contract law. *See* Midland Tar Distillers, Inc. v. M.T. Lotos, *supra*, 362 F.Supp. at 1311; Michael v. S.S. Thanasis, *supra*, 311 F.Supp. at 173. In *Cia. Naviera Continental S.A., Industria E. Commercio De Minerios, S.A.*, and *Southwestern Sugar and Molasses Co.*, *supra*, the courts were presented with incorporation clauses in which none of the identifying information concerning the charter party had been filled in. The courts interpreted this fact to unambiguously exclude those clauses from the contracts. In the instant case, there was an attempt to fill in the appropriate blanks in the bill of lading, so that the Court cannot say that the document on its face reflects an intent not to incorporate the terms of the charter party. Since the language of the bill of lading is ambiguous, the Court has looked to extrinsic circumstances to shed light on its interpretation. See *Midland Tar Distillers, Inc., supra.* The recorded negotiations clearly reflect the parties' intent, and in the Court's view the ambiguity in the bill of lading is inadvertent. The Court is reinforced in this conclusion by the fact that, were this clause struck from the contract, the parties would be left with a bill of lading with no terms other than those identifying the cargo, the consignor, and the recipient. The Carriage of Goods by Sea Act, 46 U.S.C. § 1300–1315, alone would govern the rights of the cargo owner vis-a-

vis the shipowner. Justice requires that the contract these parties clearly bargained for be enforced.

Accordingly, defendants' motion is granted.

Settle order on notice.